**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** _____ |
| **v.** | ) | |
| | ) | |
| **THE RECTOR AND VISITORS** | ) | |
| **OF THE UNIVERSITY OF VIRGINIA,** | ) | |
| **et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF JOHN DOE'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Rule 65(a), (b) of the Federal Rules of Civil Procedure, Plaintiff John Doe ("Plaintiff") respectfully submits the following memorandum of law in support of his motion for a temporary restraining order and preliminary injunction against the Defendants.

Mr. Doe was a student at the University of Virginia ("University") and was accused of sexual assault by a young woman, Jane Roe ("Ms. Roe"). Her allegations are based on events that occurred off campus and over two years ago. The events did not occur in connection with any University program or activity. Ms. Roe was not, and is not, affiliated with the University, and was not seeking access, nor is seeking access, to any University program. Mr. Doe is no longer a student and is no longer on campus.

Mr. Doe is asking the Court to enjoin the University from pursuing disciplinary proceedings against him and continuing to refuse to confer his degree, because doing so

1

would constitute violations of constitutional due process and would constitute a breach of contract between the University and Mr. Doe.  Mr. Doe is asking the Court to temporarily enjoin the University from proceeding with a Panel Hearing scheduled for July 1, 2019. At that time the University intends to convene a hearing requiring Mr. Doe to undergo the very process for which the University lacks jurisdiction.

## I.    INTRODUCTION

The University's "Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence" (hereinafter "Title IX Policy," attached as Exhibit 1), explicitly limits its jurisdiction over certain persons and specific conduct.  In incorporating and giving effect to the federal Title IX law, which requires colleges to remedy discrimination within their operations, the Title IX Policy limits its jurisdiction to students registered or enrolled for coursework, for conduct occurring on University property or within its programs, and off-campus conduct which causes "continuing adverse effects on" or "creates a hostile environment" for an individual participating in an educational program at the University.   The relevant provisions in "Section II – To Whom This Policy Applies" - are as follows:

> This policy applies to Students who are registered or enrolled for credit- or non-credit-bearing coursework ("Students");
> …
> This policy pertains to acts of Prohibited Conduct committed by or against  Students, Employees and Third Parties when:
>
> (1) the conduct occurs on University Grounds or other property owned or controlled by the University;
>
> (2) the conduct occurs in the context of a University employment or education program or activity, including, but

not limited to, University-sponsored study abroad, research, on-line, or internship programs; or

(3) the conduct occurs outside the context of a University employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties while on University Grounds[1] or other property owned or controlled by the University or in any University employment or education program or activity.

This case involves subsection (3) above.

The University has promulgated a set of regulations to be read with the Policy that are called "Procedures for Reports Against Students" ("Title IX Procedures"). *See* Exhibit 2. These procedures are consistent with the Title IX Policy where the University clarifys on page nine that "Although a report may be re-opened at any time, the University will only be able to pursue disciplinary resolution and sanctions where the Respondent *continues to be* a University "Student" (i.e., continues to be registered or enrolled for credit- or non-credit-bearing coursework at the University)." (Emphasis added).

The University has impermissibly exceeded the jurisdictional limits of its own Title IX Policy and Procedures. It is pursuing disciplinary proceedings against Mr. Doe, who is now a former University student. This fact is the sole connection to the University. Mr. Doe's accuser is not a University student, and is not otherwise affiliated with the University. As Defendant John Flood wrote in his Final Investigation Report finding Mr. Doe responsible for sexual assault, issued on May 22, 2019 (three days after

---

[1] The University refers to its campus as "Grounds."

3

graduation and when Mr. Doe was no longer registered or enrolled in classes), Ms. Roe

"…is not a University student or employee nor is otherwise seeking access to any

University program or activity that was interfered with by [Mr. Doe's] alleged conduct."

Exhibit 14.

The Final Investigation Report does not identify a single other student or member

of the University community who was negatively affected by Mr. Doe's alleged conduct,

let alone suffered a "hostile environment" that interfered with their education.  The

University has admitted that the alleged conduct did not create a hostile environment for

anyone at the University.  (Therefore, it declined to investigate a potential claim of sexual

harassment against Mr. Doe.  The same standard that exists in the sexual harassment

provision exists in the jurisdictional provision.).  Rather, Ms. Roe's allegations describe

an encounter occurring over two years ago that did not take place on University property,

and did not take place in connection with any University program or activity, or while

Mr. Doe was participating in any such program or activity.

The University refused to confer Mr. Doe's degree after he completed all degree

requirements.  He was not found responsible for any prohibited conduct under the Title

IX Policy until May 22, 2019, three days after graduation.  On May 22, 2019, he was no

longer enrolled or registered as a "Student" at the University.  Now, the University plans

to hold a hearing on this matter on July 1, 2019, to further apply its Title IX Policy

against him and potentially permanently expel him from the University.   Per the Title IX

Policy, Section VI(A)(3)(a), the panel members may review the thoroughness and

fairness of an investigation, but have no authority to assess, review, establish or overturn

the original decision of the Title IX Coordinator that jurisdiction existed under the Title IX Policy. The Panel has no authority to end the investigation on the basis of an erroneous finding of jurisdiction, but also no authority to impose sanctions on Mr. Doe because it has no jurisdiction over him.

## II. BACKGROUND

### A. John Doe.

Mr. Doe was a student at the University, until he completed all degree requirements and now is no longer registered or enrolled for classes. On the night of April 14, 2017, Mr. Doe met Ms. Roe at a private, off-campus establishment. Later in the evening, the two engaged in sexual activity. Over a year later, on August 8, 2018, Mr. Doe learned for the first time that a Title IX investigation had been opened against him. Mr. Doe maintained his innocence and denied the allegations in an affidavit.

### B. The University's Policies and Procedures.

#### 1. The University's Title IX Policy.

The University has adopted the Title IX Policy and its language makes clear it is meant to apply to its community members: "…the University is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ('Title IX')…." (Title IX Policy, p. 2).

5

As described above, the Title IX Policy also makes clear in what circumstances the University does, and does not, have jurisdiction to investigate sexual assault claims. This jurisdictional limit comports with federal Title IX law, which the University's Title IX Policy expressly incorporates and effectuates. Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999). In other words, the "language of Title IX itself…cabins the range of misconduct that the statute proscribes." *Id.* Therefore, Title IX reaches to off-campus conduct which *causes a hostile environment* to be created on campus or within the institution's programs and activities. *See*, United States Department of Education, Office for Civil Rights, September 2017 "*Q&A on Campus Sexual Misconduct.*"[2]

The University, generally consistent with federal Title IX law,[3] limits is jurisdiction to students who are enrolled in classes, for alleged conduct that occurs (1) on University owned or controlled property, (2) in the context of a University employment or education program or activity, and (3) conduct occurring outside of an education program or activity *if it has continuing adverse effects on or creates a hostile*

_____

[2] Available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf
[3] The University's inclusion of "adverse effects" is not recognized as a violation under Title IX and the phrase is vague and overbroad.

6

*environment for Students, Employees or Third Parties while on University Grounds or other property owned or controlled by the University or in any University employment or education program or activity.* These conditions are critical, given that there is no dispute that Mr. Doe's alleged conduct did not occur on University property. The alleged conduct – per University policy – must create a continuing adverse effect or a hostile environment for a student, employee or third party while on property controlled by the University. Ms. Roe's allegations do not satisfy these conditions: Mr. Doe's alleged conduct was not related or connected in any way to a University program or activity, and as the University has admitted in its Final Investigation Report, Mr. Doe's alleged conduct was not such (because it had nothing to do with the University) as to create a hostile environment for anyone on campus. Finally, consistent with the Title IX Policy, the Title IX Procedures also note that "Although a report may be re-opened at any time, the University will only be able to pursue disciplinary resolution and sanctions where the Respondent *continues to be* a University 'Student' (i.e., continues to be registered or enrolled for credit- or non-credit-bearing coursework at the University)." (Emphasis added).

### C. Mr. Doe Submits to the University That It Does Not Have Jurisdiction, but the University Continues Its Proceedings.

On May 23, 2019, Mr. Doe submitted a detailed statement, and a draft lawsuit, as to why jurisdiction did not exist to pursue this investigation. On May 31, 2019, Mr. Doe submitted a second letter warning of his pending lawsuit and requesting the University stay the Panel Hearing. Later that same day, Defendant Emily Babb emailed Mr. Doe

7

requesting his avoid dates for a Panel Hearing. On June 5, 2019, Defendant Emily Babb emailed a Notice of Hearing, setting the Panel Hearing for July 1, 2019. On June 24, 2019, Mr. Doe, through counsel, again contacted the University's Office of General Counsel regarding the jurisdictional issue. Counsel advised that a lawsuit requesting preliminary injunctive relief would be filed regarding the jurisdictional issue, and asked if the University would stay the proceeding. The Office of General Counsel responded that the Panel Hearing would not be delayed and would continue on as scheduled for July 1, 2019, in spite of a filing for preliminary injunctive relief. This investigation has languished for over a year in substantial deviation from the University's own procedures, and now the University rushes to hold a Panel Hearing, when a stay to resolve the issues raised in this case would not cause prejudice to any party.

### III.    LEGAL STANDARD

Parties seeking preliminary injunctions to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Pashby v. Delia*, 709 F.2d 307, 320 (4th Cir. 2013), citing *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The same legal standard governs the grant of a preliminary injunction and a temporary restraining order. *Levesque v. State of Me.*, 587 F.2d 81 (1st Cir. 1978).

### IV.    ARGUMENT

The Court should issue a temporary restraining order, followed by a preliminary injunction, preventing the University from subjecting Mr. Doe to disciplinary

8

proceedings with regard to the alleged sexual assault, and requiring the University to confer his degree pending the final outcome of this lawsuit. Mr. Doe is likely to succeed on the merits of his claim that the University refused to confer his degree without authority and that the panel has no authority to apply the Title IX Policy against him; he is likely to suffer irreparable harm because his employment is conditioned on the receipt of his degree and the Panel believes it is empowered to expel him; the balance of harms overwhelmingly weighs in his favor, as he stands to lose his job and degree while the University suffers no harm since Mr. Doe is no longer a student and is not on campus; and finally an injunction is in the public interest because Mr. Doe shows a likelihood of success on the merits and the public interest lies with having due process enforced.

### A. Mr. Doe is Likely to Succeed on the Merits of His Claims.

1. <u>Procedural Due Process</u>

The University initiated an investigation against Mr. Doe on August 8, 2018, over a year after the alleged conduct occurred. The investigation languished over the entire course of Mr. Doe's final year, without notices of good cause delays required by the Title IX Procedures. On May 1, 2019, he was notified by Defendant Emily Babb, the Title IX Coordinator, that the University would not confer his degree on May 19, 2019 as expected, because the investigation was ongoing. Before this, his last communication with the Title IX office was in February 2019 confirming receipt of his written statements denying the allegations against him and raising substantial doubts about the sufficiency of the evidence against him. On May 19, 2019, Final Exercises at the University occurred. Mr. Doe has not received his degree along with his fellow students. Then, on May 22,

9

2019, Defendant John Flood, Title IX Investigator, issued his Final Investigation Report finding Mr. Doe responsible – for the first time – for sexual assault. The Final Investigation Report relied on information developed by coordinating with Ms. Roe that had thus far been hidden from Mr. Doe.

There is no authority in the Title IX Policy or Procedures giving Title IX staff the ability to refuse to confer a degree to a student who has met all degree requirements and has not been found responsible for prohibited conduct while a student at the University. The University limits the application of its Title IX Policy to "Students" as defined as "registered or enrolled for credit- or not-credit-bearing coursework." (Title IX Policy, Section II). Similarly, the Title IX Procedures clarify on page nine that "Although a report may be re-opened at any time, the University will only be able to pursue disciplinary resolution and sanctions where the Respondent *continues to be* a University "Student" (i.e., continues to be registered or enrolled for credit- or non-credit-bearing coursework at the University)." Further, as discussed above, no hostile environment on campus was created by his alleged conduct and the jurisdictional requirement for off-campus conduct was not met. On May 22, 2019, when he was initially found responsible for prohibited conduct, Mr. Doe was no longer enrolled or registered for classes. He was no longer a student. Aside from this, the Title IX Policy does not give the Title IX Coordinator the authority to summarily refuse to confer a student's degree. As an end-run around the Title IX Policy and Procedures, Defendant Emily Babb tried to effectively indefinitely suspend Mr. Doe by refusing to confer his diploma, even though

10

he had completed all degree requirements.  Mr. Doe was simply notified of the University's actions.  Exhibit 3.

The Due Process Clause of the Fourteenth Amendment bars states from depriving any person of life, liberty, or property, without due process of law. U.S. Const. amend. XIV, § 1.  Procedural due process requires that individuals are afforded certain minimum procedures before they are deprived of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  Generally, those minimum procedures must ensure that the individual has the opportunity to be heard at a meaningful time and in a meaningful manner.  *Id.* at 333.  Due process is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (internal quotations omitted).  Determinations about the procedures used to potentially deprive an individual of a property or liberty interest are made based on the specific facts and circumstances at issue. Courts consider: 1) the nature of the private interest affected by the deprivation; 2) the risk of erroneous deprivation in the current procedures used, and the probable value, if any, of additional or alternative procedures; and 3) the governmental interest involved, including the burden that additional procedures would entail. *Id.* at 335.

The Supreme Court has held that school disciplinary hearings implicate a student's liberty or property interest and that students must receive due process. *See Goss v. Lopez*, 419 U.S. 565, 573, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975); *see also Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 613 (E.D. Va. 2016)(liberty interest implicated when school alters status as student); *Doe v. Alger*, 175 F. Supp. 3d

11

646, 657 (W.D. Va. 2016)(property interest may arise where university substantially limits its ability to suspend, expel or dismiss its students through adoption of certain policies). The amount of process due is contingent on the length and severity of the suspension terms. In the context of a suspension of ten days or less, due process requires that a student receive oral or written notice of the charges against him and an opportunity to present his story. *Broussard v. Sch. Bd. of Norfolk*, 801 F. Supp. 1526, 1532 (E.D. Va. 1992) (citing *Goss*, 419 U.S. at 581).

Here, on May 1, 2019, Defendant Emily Babb summarily issued notice of the University's refusal to confer Mr. Doe's degree, which amounted to an indefinite suspension. This, despite the fact that he had already been evaluated in August 2018 and deemed not a threat to the University community (*see also* Exhibit 14), and without having found him responsible for sexual assault. (He was found responsible for sexual assault three days after graduation, when he was no longer a "Student" as defined by the Title IX Policy). In fact, there was no need for the University to summarily confiscate his diploma, such as quick action to safeguard the community, or for any other reason, except that the University was attempting to remedy its own delays in the resolution of its investigation.

Nor does the existence of the Panel Hearing cure the fact that there was no pre-deprivation hearing. Mr. Doe was summarily and effectively suspended on May 1, 2019, without cause under the University's procedures; the University refused to confer his degree despite having met all degree requirements. Here, Mr. Doe, in being deprived of his degree for an unspecified length of time in the notice issued on May 1, 2019, was not

12

even afforded the process constitutionally required of a 10-day suspension under the *Goss* standard.  Finally, the deprivation he sustained was without authority under the University's own procedures.

    2.    <u>Substantive Due Process</u>

While the Due Process Clause of the Fourteenth Amendment bars states from depriving any person of life, liberty or property, without due process of law, the clause guarantees more than fair process.  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion) (internal quotation marks omitted).  The substantive component of the Due Process Clause bars certain government actions regardless of the fairness of the procedures used to implement them. *Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir. 1990) citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986)(quotations omitted).   The government conduct must be shocking.  "In other words, the protections of substantive due process extend only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any predeprivation procedural protections or of adequate rectification by any post-deprivation state remedies."  *Richter v. Beatty*, 417 Fed. Appx. 308, 310-311 (4th Cir. 2011).

The University has, in the context of an investigation which has generally substantially deviated from policy requirements, applied its Title IX Policy to reach a former student that it does not have jurisdiction over.  As discussed above, the Title IX Policy explicitly incorporates and effectuates federal Title IX law, and the Title IX Policy

prohibits conduct that is prohibited by that federal statute. Title IX and the Title IX Policy both require the University to remedy gender discrimination within its operations and spheres of control. As such, colleges and universities are required to remedy hostile environments on campus that are created by off-campus conduct. Consequently, the University limits its reach to off-campus conduct *only* where it has "continuing adverse effects on"[4] or "creates a hostile environment" within University operations.

As Defendant John Flood wrote in his Final Investigation Report finding Mr. Doe responsible for sexual assault, issued on May 22, 2019, Ms. Roe "…is not a University student or employee nor is otherwise seeking access to any University program or activity that was interfered with by [Mr. Doe's] alleged conduct." Exhibit 14. Therefore, the University did not investigate or pursue a sexual harassment claim against Mr. Doe. The same exact standard is encapsulated in the jurisdictional provision.

The University has arbitrarily and irrationally applied its Title IX Policy to an individual who was no longer a "Student," as that word is defined, for conduct that does not fall within the reach of the jurisdictional provisions. The University has admitted that Ms. Roe's education was not interfered with by Mr. Doe's alleged conduct, because she is not a student or employee, or even seeking access to any University program or activity. The University allowed Mr. Doe, after the allegations were made, to move unrestricted on campus both physically and in his activities and classes. The University

---

[4] Although the University's Title IX Policy invokes jurisdiction for "continuing adverse effects" – this standard is not recognized as a violation of Title IX. It is also vague and overbroad.

took no remedial action to address any hostile environment or even "adverse effects" – because there were none.

Mr. Doe has raised this issue extensively and frequently ever since Defendant Babb issued notice that the University would refuse to issue his degree. The University's response was to schedule a Panel Hearing, and then refuse to stay the hearing pending the outcome of this lawsuit. The Panel members – per the Title IX Policy and Procedures – have no authority to review, assess, evaluate, or end an investigation based on the jurisdictional provisions. The University's actions are egregious, arbitrary, and capricious, and will not be remedied by Mr. Doe further submitting to a process that does not apply to him.

       3.    <u>Breach of Contract</u>

The evidence in this case will establish that Mr. Doe paid tuition at the University for the four years of his enrollment as a student and that, in exchange, the University agreed to confer Mr. Doe's undergraduate degree provided that he fulfilled certain requirements. Mr. Doe had a contractual relationship with the University, through the payment of money in exchange for an education. In return for Mr. Doe paying the required tuition and fees in a timely manner, the University agreed to provide an undergraduate educational program which required earning the requisite number of credit hours earned over several years in order to be eligible for a degree. The evidence will establish that Mr. Doe entered into a relationship with the University that entitled him to be enrolled so long as he paid the required fees, remained in good standing academically as he pursued academic coursework needed to earn a degree, otherwise met the

15

requirements for graduation and complied with the University's conduct rules. In addition to the payment of tuition, Mr. Doe fulfilled all the requirements for his degree.

Under these circumstances, the parties had at least an implied contract, and specifically, a contract implied-in-fact. *Doe v. Alger*, 228 F.Supp. 3d 713 (W.D. Va. 2016) (Virginia distinguishes between two types of implied contracts: contracts that are implied-in-fact and contracts that are implied-in-law. An implied-in-fact contract is an actual contract that was not reduced to writing, but the court infers the existence of the contract from the conduct of the parties…By contrast, the concept of an implied-in-law contract, or quasi contract, applies only when there is not an actual contract or meeting of the minds. *Rosetta Stone Ltd. v. Google, Inc*., 676 F.3d 144, 165-66 (4th Cir. 2012) (internal citations omitted)." "Such a contract is still a contract under Virginia law." Mr. Doe will establish a mutual understanding and assent, as well as a practice, and therefore an enforceable entitlement under Virginia law.

Mr. Doe has also pled and the evidence will establish that the University's actions in withholding his degree were arbitrary and capricious. Mr. Doe's payment of tuition at least creates a single enforceable term of an implied contract, *i.e*., that the University cannot withhold his degree for an arbitrary and capricious reason. Mr. Doe has pled sufficient factual allegations in his Complaint which support a plausible inference that the University breached this implied term. *See Doe v. Marymount Univ.*, 297 F.Supp. 3d 573 (2018) (where no evidence existed that University acted arbitrarily and capriciously in suspending student, student failed to assert viable breach of contract claim). Here, the

University has treated Mr. Doe irrationally and has therefore breached a contract between them.

**B.    Mr. Doe Will Suffer Irreparable Harm Without Injunctive Relief.**

Mr. Doe will suffer irreparable harm if the Court does not grant injunctive relief. Mr. Doe's employment was conditioned on the receipt of his degree on May 19, 2019, which the University refused to confer without authority under its Title IX Policy and Procedures. The Panel Hearing which the University scheduled for July 1, 2019, and refuses to stay despite an investigation that has languished without explanation for almost a year, has no authority to set aside the Title IX Coordinator's determination that jurisdiction exists to sanction Mr. Doe. At the same time it has no authority to address the jurisdictional issue, it is empowered to expel Mr. Doe permanently, which would ensure the immediate loss of his employment. The University's investigation, as detailed in the Complaint, consistently and substantially deviated from required procedures. Mr. Doe now stands to lose a great deal from the continuation of this aberrant process, which the University has no jurisdiction to initiate in the first place.

It will cause Mr. Doe irreparable harm even if he is found not responsible of sexual assault. He has suffered, and will suffer harm as a result of the anticipated hearing and any further disciplinary process. He has already spent substantial time and money defending false allegations and defending himself in a proceeding the University had no authority to commence or pursue. He has suffered extreme anxiety and stress having been accused of the conduct alleged, having been investigated for the conduct alleged, and having been preliminarily found responsible for a sexual assault he did not commit.

17

He will lose more, financially and otherwise, if found responsible and suspended or expelled.

### C.     The Balance of Harms Weighs in Mr. Doe's Favor.

Mr. Doe stands to immediately lose his job by participating in the Panel Hearing. By contrast, an injunction will not injure the University, Defendants, or anyone at the University, in any way.  Mr. Doe has never been accused of sexual misconduct before Ms. Roe's accusations, and has no disciplinary record.  He fulfilled all degree requirements as of May 19, 2019, the day the University should have conferred his degree.  Three days after graduation, and three days after Mr. Doe was no longer enrolled or registered for classes, he was found responsible for a sexual assault allegedly occurring over two years ago.  He does not live in Virginia and is no longer on campus.  At the start of the investigation, when its Evaluation Panel declined to impose any restrictions on Mr. Doe, the University admitted that Mr. Doe was not a threat to anyone on campus.   A temporary injunction will not change or destroy any material aspect of the University's procedures, while submitting to the Panel Hearing might likely cause the permanent loss of his employment due to the extended time needed to complete this litigation.  *See, e.g. Faulkner v. Jones*, 10 F.3d 226, 233 (4th Cir. 1993)(holding that balance of harms weighed in student's favor where any temporary adverse impact would be reversible for the college, but where impact might become permanent for student due to length of litigation).

18

**D.    An Injunction is in the Public Interest.**

An injunction is in the public interest because Mr. Doe poses no threat to the University community and he seeks a remedy for the University's misapplication of its own policies which constitute due process and contract violations that likely have affected, and will affect, other students.

The University has admitted that Mr. Doe is not a threat to anyone in the University and that he did not cause a hostile environment on campus.  Exhibit 14.   He has no disciplinary record and no one else has filed any complaint against him.  The University imposed no restrictions on his presence on campus or activities during the entire duration of the investigation.  He is no longer a student and is not present on campus.

Mr. Doe has identified a violation of the University's own policies which govern all students at the University.  These violations constitute not only significant departures from the stated procedures, but rise to the level of constitutional due process violations and breach of contract.  There are likely other students who have been affected or will be affected by the University's erroneous application of its Title IX Policy.  Mr. Doe's request for a preliminary injunction serves the public interest because he seeks to enjoin the University from violating federal rights and to require it to comport with constitutional due process.  *See Pashby v. Delia*, 709 F.3d 307, 330 (4th Cir. 2013)(Plaintiffs' attempt to enforce accessibility to federal benefits program was in the public interest).

WHEREFORE, John Doe respectfully requests that his Motion for Temporary Restraining Order and Preliminary Injunction be granted.

JOHN DOE

By counsel

ST. JOHN, BOWLING, LAWRENCE & QUAGLIANA, LLP

By:    */s/Rhonda Quagliana*
      Rhonda Quagliana (VSB# 39522)
      Francesca E. Fornari (VSB#70989)
      416 Park Street
      Charlottesville, Virginia 22902
      (434) 296-7138
      Facsimile: (434) 296-1301
      rq@stlawva.com
      fef@stlawva.com
      Counsel for Plaintiff John Doe

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2019, the foregoing, including those exhibits designated to be filed under seal, was served by electronic mail to Defendants' counsel, Timothy J. Heaphy, at the University of Virginia Office of General Counsel at

theaphy@virginia.edu.

*/s/ Rhonda Quagliana*

20
