**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.  3:19-cv-38** |
| **v.** | ) | |
| | ) | |
| **THE RECTOR AND VISITORS** | ) | |
| **OF THE UNIVERSITY OF VIRGINIA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF JOHN DOE'S MOTION FOR INJUNCTIVE RELIEF

Pursuant to Rule 65(a), (b) of the Federal Rules of Civil Procedure, Plaintiff John Doe ("Mr. Doe" or "Plaintiff"), respectfully submits the following Supplemental Memorandum of Law in support of his motion for a preliminary injunction against the Defendants.  Mr. Doe seeks preliminary relief in the form of an order precluding the University from pursuing further disciplinary resolution and sanctions and requiring the University to confer Mr. Doe's degree effective the date it was originally to be conferred.

Procedural History

Mr. Doe filed a Complaint against the University of Virginia and its officials on June 25, 2019 ("the University" and "the Defendants").  The Complaint seeks declaratory relief and preliminary and permanent injunctions against the Defendants.  Mr. Doe filed a motion for a temporary restraining order and preliminary injunction, and a memorandum in support on the same date.  The Court held a telephonic hearing on June 27, 2019.  The

Court issued an order and memorandum opinion on June 28, 2019, granting in part the temporary restraining order and preliminary injunction with respect to a University proceeding scheduled to occur on July 1, 2019, and ordering additional briefing prior to ruling on Mr. Doe's remaining requested preliminary relief.

As this hearing is a continuation of the aforementioned proceeding, Mr. Doe incorporates by reference the pleadings already filed in the case and the record developed thus far.

Brief Statement of Facts

On August 8, 2018, the University issued a Notice of Investigation to Mr. Doe under its Title IX Policy[1] ("Policy") for sexual assault (under the Policy's definition of "Prohibited Conduct") alleged to have occurred in his off-campus apartment in April of 2017, when Mr. Doe was in his second year at the University. The complainant, ("Ms. Roe"), was not affiliated with the University in any way, nor seeking access to the University's educational programs or activities. The Notice of Investigation incorporated by attachment the University's Title IX Policy, Procedures for Reports Against Students ("Procedures")[2], Resource and Reporting Guide for Students, infographic and list of potential advisors. In their salient provisions, the Policy and Procedures promise prompt and equitable resolution; establish timeframes for completion; require notice of any delay for good cause; advise that neither party must participate and that no negative inferences may be drawn from a party's non-participation; and provide for timely and equal access

---

[1] The University's Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence is filed at ECF No. 3-2.
[2] The University's Procedures for Reports Against Students is filed at ECF No. 3-3.

to any information used to determine a student's responsibility for the misconduct alleged.

Under the University's Policy and Procedures, once "Formal Resolution" commences, which was the case here, the University convenes an Evaluation Panel and conducts a threat assessment to determine whether to impose remedial measures (designed to address a complainant's safety and well-being and continued access to educational opportunities) and protective measures (involving action against a Respondent). The University retains full authority to impose and/or modify measures to remediate the effects of "Prohibited Conduct" or to protect its students, employees, and third parties. Following the threat assessment, in Mr. Doe's case the University imposed no remedial or protective measures.

The investigation languished over the course of Mr. Doe's fourth and last year at the University, lasting approximately five times longer than permitted under the University's regulations. On May 1, 2019, Mr. Doe received e-mail notification from Defendant Emily Babb ("Defendant Babb"), the Title IX Coordinator, that his degree would be withheld. By that time, Mr. Doe had accepted an offer of employment contingent on his graduation from the University. Mr. Doe was not conferred his degree on graduation weekend, May 18-19, 2019. At the time of his graduation, Mr. Doe had not been found in violation of any University policy or regulation and had met all degree requirements.

Mr. Doe was no longer enrolled or registered for any classes, having met all academic requirements to receive his degree. On May 21, 2019, Mr. Doe received

notification from the Title IX investigator, Defendant John Flood ("Defendant Flood") that the Final Investigative Report ("Final Report") in Mr. Doe's case would be issued the following day. On May 22, 2019, the Final Report found under the University's Title IX Policy, Mr. Doe *not* responsible for sexual assault alleged by the complainant to have occurred at a private commercial restaurant – but responsible, by a preponderance of the evidence, for sexual assault alleged by the same complainant to have occurred later that evening at his private, off-campus apartment. Mr. Doe objected to the finding of responsibility, raising issues of basic fairness, asserting that he did not have an equal opportunity to be heard, and challenging the University's authority under its Policy to pursue disciplinary action and sanctions.

In finding Mr. Doe responsible for sexual assault, the Final Report relied on an interview of the complainant's friend that Defendant Flood conducted on April 30, 2019, and relied on the complainant's cellular call records Defendant Flood collected directly from the complainant on April 29, 2019. This information had not been disclosed to Mr. Doe and he learned of it for the first time in the Final Report. At the same time, the Final Report excluded without explanation, Mr. Doe's Supplemental Affidavit and Response, the receipt of which was acknowledged in an e-mail from Defendant Flood on February 13, 2019.

Mr. Doe received no notices, communications, or information of any kind from the University from February 14, 2019, until May 1, 2019, when Defendant Babb informed Mr. Doe by e-mail that his degree would be summarily, and at that time – indefinitely – withheld. Mr. Doe was notified on June 5, 2019, that the University

intended to convene a Review Panel Hearing on July 1, 2019. The University's Title IX

Policy and Procedures provided Mr. Doe with no opportunity to be heard on the threshold

issue of the University's authority to adjudicate his disciplinary matter. Mr. Doe

informed the University in writing of his objection that the "University lacks jurisdiction

over this matter under its own Policy." The University acknowledged receipt of Mr.

Doe's objection, but insisted on scheduling a Review Panel Hearing, at which he would

have no opportunity to object to the University's jurisdiction. Mr. Doe's efforts to be

heard on the issue of the University's authority to continue pursuing disciplinary

resolution and sanctions were ignored and forced him to file suit.

<u>Standard of Review</u>

Parties seeking preliminary injunctions must demonstrate that (1) they are likely to

succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of

hardships tips in their favor, and (4) the injunction is in the public interest. *Pashby v.

Delia*, 709 F.3d 307, 320 (4th Cir. 2013), citing *Winter v. Natural Resources Defense

Council, Inc*., 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). This lawsuit is

neither late nor premature. To prevail on a procedural due process claim, the plaintiff

must establish that he possessed a protected liberty or property interest, that the state or

its agents deprived him of his interest, and that this deprivation was effectuated without

constitutionally sufficient process. *Doe v. Rector & Visitors of George Mason Univ.*, 149

F. Supp. 3d 602, 613 (E.D. Va. 2016). With respect to liberty interests, "injury to

reputation alone does not deprive an individual of a constitutionally protected liberty

interest." *Id.* (internal quotations and citation omitted). Rather, a "reputational injury

[must be] accompanied by a state action that distinctly alters or extinguishes a legal status." *Id.* (internal quotations and citation omitted).

A constitutionally protected liberty and property interest in this case was implicated on May 18, 2019, when the University withheld Mr. Doe's degree, and on May 22, 2019, when Defendant Flood found him responsible for Sexual Assault and Mr. Doe was subject to sanctions, including expulsion, by the Defendants. This controversy became ripe when the Title IX Coordinator, Defendant Babb, and University's General Counsel rebuffed Mr. Doe's arguments that the University did not have authority to discipline him in this case, and just after Defendant Babb sent a notice of hearing in Mr. Doe's case. *See Delia,* 709 F.3d at 317 (claim ripe where plaintiffs did not challenge outcome of their administrative appeals where appeals process was not complete, and were instead contesting the agency's decision to implement a policy that affected them).

While typically the remedy for failure to provide due process is more due process, this Court has the flexibility to fashion a remedy suited to the particular facts and circumstances of this case, in order to see that justice is done. *Doe v. Rector & Visitors of George Mason Univ.,* 149 F. Supp. 3d 602, 624 (E.D. Va. 2016).

<u>Summary of Argument</u>

Lacking authority under the plain terms of their Title IX Policy and Procedures, the Defendants violated Mr. Doe's due process rights by subjecting him to disciplinary action, damaging his reputation and threatening expulsion, and summarily and without a hearing depriving him of his degree. The applicable Policy and Procedures include no mechanism for Mr. Doe to be meaningfully heard on these issues. The Defendants have

made clear their position: their Policy and Procedures provide them with full authority to pursue disciplinary resolution and sanctions against Mr. Doe. According to the Defendants, Mr. Doe's only available option is to submit to a proceeding whose limited purpose deprives Mr. Doe of any meaningful hearing on his threshold claim: that under its Title IX Policy, the University lacks basic authority to discipline him for off-campus conduct and now that he is no longer a University "Student." Defendants concede that Mr. Doe raises a colorable claim. Defendants concede no procedures exist for redressing Mr. Doe's objections to the University's authority to pursue disciplinary resolution or sanctions. Defendants' admissions establish that their actions violate the procedural due process rights of Mr. Doe.

The University's Title IX Policy requires jurisdiction over (1) person and (2) place. Mr. Doe seeks preliminary injunctive relief because: (1) the University fully intends to further pursue disciplinary resolution and sanctions against Mr. Doe who is no longer a "Student" as defined in the University's Title IX Policy; and, (2) the alleged "Prohibited Conduct" involved an alleged off-campus incident which, under the University's Title IX Policy, requires the "Prohibited Conduct" create a hostile environment or have continuing adverse effects on students, employees, or third parties within the University's programs and activities.

The University conceded no hostile environment existed. Instead, the Defendants argue that "continuing adverse effects" applies. The phrase "continuing adverse effects" is so vague as to violate due process. The Policy and Procedures nowhere define or illustrate the meaning of "continuing adverse effects." Unlike "hostile environment,"

neither the Title IX statute, nor the regulations or cases interpreting it, define "continuing adverse effects." Moreover, the University urges an extreme interpretation of its Policy under the specific facts of this case. No evidence exists in this case of "continuing adverse effects" on students, employees, or third parties. Mr. Doe was not found responsible for misconduct while a "Student," as the Title IX Policy defines that word. The University never exercised its authority to respond to any "continuing adverse effects" during the time Mr. Doe was a "Student." In addition, the University must concede that Mr. Doe is no longer a "Student." He completed the requirements for his undergraduate degree and is no longer enrolled in credit- or non-credit bearing coursework at the University. No credible argument exists, at this point, that the University may exercise authority over a non-"Student" to address "continuing adverse effects" of alleged "Prohibited Conduct."

The Defendants have substantially deviated from their own procedures. They have failed to adhere to their own deadlines and promises of "prompt and equitable" resolution without any reasonable explanation or justification, dragging the proceedings out for nearly a year, resulting in their withholding of Mr. Doe's degree. The Defendants did not provide Mr. Doe with an equal opportunity to review and respond to evidence as the complainant was afforded. Finally, Defendants deprived Mr. Doe of property and liberty interests without any pre- or prompt post-deprivation hearing. Defendants continue to deprive him of his property and liberty after it is entirely clear that Mr. Doe may not be disciplined or sanctioned when he is no longer a "Student." The University's insistence on continuing to pursue disciplinary resolution and sanctions against Mr. Doe

substantially deviates from the notice Mr. Doe received when the University commenced action under its Title IX Policy and Procedures.

I.    The University violated Mr. Doe's due process rights when it erroneously subjected him to a procedure that did not apply to him and provided no recourse on this issue.

**A.    Applicable legal principles.**

Mr. Doe asks the Court to ensure "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss v. Lopez*, 419 U.S. 565, 581, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975). The Fourteenth Amendment protects against state action that involves a deprivation of "life, liberty, or property, without due process of law…[or a denial of] equal protection of the laws." U.S. Const. Amend. XIV, § 1. "…Identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

Public universities can neither write themselves out of the Constitution by authoring their own procedures and then complying with them; nor does a due process violation instantly accrue if there has been a departure from stated procedures. However, where, as here, the government procedures provide for the fundamental guarantees of due

process, a significant departure from those procedures may cause a constitutional due process violation. *Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713, 717, 1983 (4th Cir. 1983). The Supreme Court has recognized that there exists the possibility of an institution's interpretation of its regulations that is "so extreme as to be a violation of due process." *Id.* (citation omitted).

Due process requires notice and an opportunity to be heard. *Mathews v. Elridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The process due in any particular case is governed by what the particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L Ed. 2d 484 (1972). The more serious the deprivation, the more demanding the process and where the deprivation is based on disciplinary misconduct, rather than academic performance, courts conduct a more searching inquiry. *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) (internal quotations and citation omitted). Where a student faces expulsion, the notice should contain a statement of specific charges and the grounds which, if proven, would justify expulsion under the regulations of the University. *Doe v. Alger*, 228 F. Supp. 3d 713, 729 (W.D. Va. 2016), citing *Cobb v. Rector & Visitors of Univ. of Va.,* 69 F. Supp. 2d 815, 828-29 (W.D. Va. 1999).

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13, 98 S. Ct. 1554, 1562, 56 L. Ed. 2d 30, 41 (1978) (internal quotations and

citation omitted).  The notice, to be constitutionally adequate, must provide a means to object to the government's actions as unjustified. *Id.*

### B.    The August 8, 2018, Notice of Investigation.

The Notice of Investigation ("Notice") in this case was issued to Mr. Doe on August 8, 2018.  *See* Exhibit 1 - Second Affidavit of John Doe ¶ 2.  The Notice informed Mr. Doe that the University initiated a Title IX investigation against him and Formal Resolution, under the University's Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence (the "Policy") for Sexual Assault and Sexual Harassment ("Prohibited Conduct").  *Id.* at ¶ 3(a).  The Notice attached and incorporated by reference the University's Title IX Policy and Procedures.  *Id.* at ¶¶ 3(b) and (c).  The Notice quoted at length the Title IX Policy and Procedures.  Although reserving the right to do so, the Notice advised Mr. Doe of no violation of any other University policy. The Notice provided Mr. Doe with reassurance that, should other potential violations become known, "an Amended Notice of Investigation will be issued to both parties, and both parties will be provided an opportunity to respond." *Id*. at ¶ 3(a).  No Amended Notice of Investigation was ever issued.  *Id.* at ¶ 4.

The Notice stated that a Formal Resolution process would be pursued, referenced the 60-day time period for resolution, and re-stated the language from the Procedures that should "extensions of time need to be granted for good cause shown, you will be notified in writing."  The Notice stated that Mr. Doe and the complainant "will have an equal opportunity to be heard, to submit information and corroborating evidence…" Referencing Section III of the Title IX Procedures, the Notice stated, among other things,

that Mr. Doe can expect "prompt and equitable" resolution of allegations of Prohibited

Conduct; "the opportunity to be heard…as to the determination of a policy violation and

the imposition of any sanction(s);" and "timely and equal access to any information that

will be used during the Formal Resolution proceedings and related meetings."

The Notice did not provide for any opportunity to be heard on whether the

University has authority to adjudicate the matter under the "To Whom This Policy

Applies" section of the Title IX Policy. In later proceedings before this Court, the

University confirmed the absence of any mechanism Mr. Doe could utilize to be heard on

the issue of whether the University's jurisdiction applied. The Notice and the Procedures

were defective in this regard.

C.     **"To Whom This Policy Applies:" The University's authority to pursue disciplinary resolution and sanctions is dependent on the continuing status of that person as a "Student."**

Section II of the University's Policy states as follows:

> This policy applies to Students who are registered or enrolled
> for credit- or non-credit-bearing coursework ("Students");
> …
> This policy pertains to acts of Prohibited Conduct committed
> by or against Students, Employees and Third Parties when:
>
> (1) the conduct occurs on University Grounds or other
> property owned or controlled by the University;
>
> (2) the conduct occurs in the context of a University
> employment or education program or activity, including, but
> not limited to, University-sponsored study abroad, research,
> on-line, or internship programs; or
>
> (3) the conduct occurs outside the context of a University
> employment or education program or activity, but has
> continuing adverse effects on or creates a hostile environment

> for Students, Employees or Third Parties while on University
> Grounds or other property owned or controlled by the
> University or in any University employment or education
> program or activity.

This case involves the "Student" definition above and subsection (3) regarding off-campus conduct.  The University conceded in its Final Report that no hostile environment was created by Mr. Doe's alleged conduct.  Instead, the University argues that although he ceased to be a "Student" while the investigation was pending and had not been found responsible for any misconduct as a "Student," Mr. Doe's alleged conduct creates unspecified "continuing adverse effects" on the "University community" conferring the University's authority to pursue disciplinary resolution and sanctions in this case.

The Title IX Policy unequivocally applies to "Students – defined as those who are "registered or enrolled for credit- or non-credit-bearing coursework."  The Title IX Procedures provide that the "University will only be able to pursue disciplinary resolution and sanctions where the Respondent *continues* to be a University 'Student' (i.e., continues to be registered or enrolled for credit- or non-credit bearing coursework at the University)." (Emphasis added).  The University's definition of "Student" comports with its incorporation of the Title IX statute into its Policy, because the statute limits its application to persons over which the University exercises substantial control. [3]

---

[3] Other University documents similarly acknowledge the limits of the University's authority to "Students."  The University's "Resource and Reporting Guide for Students" attached to the Notice issued to Mr. Doe was Appendix A-1, which states on Page 9:

> Although there is no time limit for reporting Prohibited Conduct to
> the University, the University's ability to respond may diminish
> over time, as evidence may erode, memories may fade, and
> *Respondents may no longer be affiliated with the University*. If the

There is no dispute that by May 18, 2019, Mr. Doe was no longer registered or enrolled for credit- or non-credit-bearing coursework, and that he was not found responsible for any misconduct during his time as a "Student" at the University.

### D. "Continuing adverse effects" is overbroad and vague.

The University's reliance on "continuing adverse effects" as authority to adjudicate disciplinary resolution and sanctions for off-campus conduct offends due process. Such language fails to provide reasonable notice of what is prohibited and engenders *ad hoc* resolution on a subjective basis – risking arbitrary and discriminatory application. The phrase "continuing adverse effects" is vague on its face and overbroad in the University's application to this case:

> Vague rules offend the due process clause because they deny a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. A vague disciplinary rule also impermissibly delegates basic policy matters to…(officials charged with its enforcement) for resolution on an Ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Hirschkop v. Snead*, 594 F.2d 356, 370-371 (4th Cir. 1979) (*en banc*) (*per curiam*), citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 2298-2299, 33 L. Ed. 2d 222 (1972) (internal quotations omitted).

The void-for-vagueness doctrine under the Due Process Clause is grounded in principles of fair warning and notice, and all vagueness challenges require the court to answer (1)

---

> Respondent is no longer a Student or an Employee, the University will provide reasonably appropriate remedial measures, assist the Complainant in identifying external reporting options, and take other reasonable steps to respond under Title IX. (Emphasis added). *See* Exhibit 1 at ¶ 3(d).

whether the regulation gives adequate notice, and (2) whether it creates a threat of arbitrary enforcement. *Fauconier v. Clarke*, 257 F. Supp. 3d 746, 759 (W.D. Va. 2017) (rejecting a facial and as-applied challenge on summary judgment where a prison defined the regulation's terms "in objective detail" and provided examples to inmates of what would violate the regulation), citing *Smith v. Goguen*, 415 U.S. 566, 572, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974) and *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253, 132 S. Ct. 2307, 183 L. Ed. 2d 234 (2012).

In *Snead,* the Fourth Circuit held that a disciplinary rule subjecting lawyers to professional misconduct investigations for making statements about matters that are "reasonably likely to interfere with a fair trial" was so imprecise as to constitute a trap and would cause lawyers to be subject to discipline "on a subjective basis depending entirely on what statements the disciplinary authority believes reasonably endangers a fair trial." *Hirschkop v. Snead*, 594 F.2d at 371. The disciplinary rule neither informed lawyers nor the disciplinarian "where to draw the line between what is permissible and what is forbidden." *Id.*, citing *Nebraska Press Association v. Stuart*, 427 U.S. 539, 545, 568, 96 S. Ct. 2791, 2807, 49 L. Ed. 2d 683 (1976) (holding that a ban on reporting facts "strongly implicative of the accused" was unconstitutionally vague and broad).

The Policy defines "hostile environment" as conduct which is:

> …sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating or benefitting from the University's education or employment programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective.

The Policy provides that, in evaluating whether a hostile environment exists, the University "will consider the totality of known circumstances" and lists seven factors to guide the determination. The Title IX Policy and Procedures nowhere define "continuing adverse effects." The Policy and Procedures identify no factors for determining the existence of "continuing adverse effects." The Policy and Procedures include no language for determining whether "continuing adverse effects" is evaluated under an objective or subjective standard. For instance, if someone simply knows about an allegation of sexual assault, does that knowledge constitute "continuing adverse effects?" The Policy fails to define what harm must occur. Must the harm be adverse to someone's education, or simply harmful to their person? How harmful? The Policy provides no definition of "continuing" such that someone could reasonably interpret the scope of the phrase "continuing adverse effects." If an adverse effect is felt twice in one year, is it "continuing?" The Policy provides no means by which to understand what is "adverse." What is an example of an adverse effect on a Student, on an Employee, or on a Third Party?

Unlike *Fauconier v. Clarke,* where prison officials defined the terms of the challenged regulation in "objective detail" and provided examples of offenses, the University's meaning of "continuing adverse effects" is utterly indecipherable. Like *Hirschkop v. Snead*, the language is imprecise and subject to what University officials interpreting the Title IX Policy *believe* are "continuing adverse effects" – as exemplified by the interpretation the University's Office of General Counsel asserts in its pleadings.

The phrase does not give sufficient notice to persons subject to its provisions and creates a risk for arbitrary and discriminatory application.

     E.     **The University's interpretation of the phrase "continuing adverse effects" is extreme given the facts of this case: there simply were no continuing adverse effects.**

Mr. Doe was not found responsible for any violation while he was a "Student," as "Student" is defined in the Title IX Policy. The University conceded that the Complainant was not affiliated with the University in any way, nor seeking access to its educational programs, and therefore no hostile environment was created. Pursuant to its Title IX Procedures, the University convened an Evaluation Panel to evaluate whether "the reported information or any other available information provides a rational basis for concluding that there is a threat to the health or safety of the Complainant or to any other member of the University community." The Title IX Policy provides for the imposition of remedial and protective measures designed to ensure the complainant's continued access to educational programs or to take action against the respondent to protect the complainant "or any other member of the University community," to include no-contact directives, residence modifications, academic modifications and support, and interim disciplinary suspension.

No remedial or protective measures were imposed during the entire pendency of the investigation. From the time the Notice was issued, up to and including the date of the University's commencement exercises, the University allowed Mr. Doe full access to University owned and controlled property. He attended classes and participated fully in all educational and other University programs. He enjoyed unrestricted contact with the

17

University's employees, other students, and third parties, as well as the other attendees. Mr. Doe was allowed to fully and freely participate in commencement ceremonies, in view of all students, professors, and staff at the University. There is simply no evidence that Mr. Doe caused any "continuing adverse effects" on "Students, Employees or Third Parties while on University Grounds or other property owned or controlled by the University or in any University employment or education program or activity."[4]

Similarly, the University's position is untenable that Mr. Doe could cause "continuing adverse effects" after he was no longer a "Student." Here, Defendants argue that "allowing *a student* who has been investigated and found responsible for sexual assault to go without a finding of responsibility or sanction *necessarily will have* a 'continuing adverse effect' on the University community at large." ECF No. 6, Pageid# 162 (emphasis added). No such standard exists in the University's Title IX Policy. Mr. Mr. Doe was not found responsible for any misconduct while a "Student" at the University. The Title IX Policy purports to sanction current "Students" for Prohibited Conduct occurring off-campus that has "continuing adverse effects" on a "Student, Employee, or Third Party" while on University property or within its programs and activities. If the University is correct that a former "Student" can be sanctioned for alleged off-campus conduct involving an unaffiliated third party because it *necessarily causes* unexplained "continuing adverse effects" on the "University community," then

---

[4] *See, e.g.*, *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, fn. 5 (E.D. Va. 2016) ("Because certain of Roe's [non-student] allegations related to sexual activity *occurring on GMU's campus*, GMU had jurisdiction to adjudicate any sexual misconduct plaintiff may have committed during those incidents.") (emphasis added).

jurisdiction *always* exists and the University's Title IX Policy's jurisdictional provisions are rendered meaningless. The University's interpretation is extreme.

**F.    "Continuing adverse effects" is not recognized as a violation of Title IX.**

The University's Title IX Policy explicitly incorporates the federal Title IX statute and its limitations and defines violations by students under the same terms as the statute. The University's Title IX Policy states that the:

> University is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities. *To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX")*…ECF No. 3-2, Pageid# 49 (emphasis added).

In explicitly incorporating the statute, the University's Title IX Policy specifically delineates three grounds for jurisdiction necessary to pursue disciplinary resolution and sanctions against its "Students," designed to remedy sex discrimination occurring within the University's operations and activities – the same purpose underlying the Title IX statute. As such, the Title IX Policy limits its application to "Students who are registered or enrolled for credit- or non-credit-bearing coursework" for conduct occurring off-campus only where the conduct "has continuing adverse effects on or creates a hostile environment for Students, Employees or Third Parties" while they are on University Grounds or in any University education program or activity. ECF No. 3-2, Pageid# 50. While the "hostile environment" standard is defined in the University's Policy and in case law interpreting the federal Title IX statute, "continuing adverse effects" is not

19

defined anywhere in the Title IX Policy or Procedures, and it is not a concept recognized by courts or federal regulators interpreting the Title IX statute.

The Supreme Court has explained that the Title IX statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644, 645 (1999) (liability arises where university exercises substantial control over both the harasser and the context in which the known harassment occurs). In other words, the "language of Title IX itself…cabins the range of misconduct that the statute proscribes." *Id.* Title IX is violated where harassment occurs unabated that is "so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. This is the hostile environment standard. The University's Policy mirrors these limitations of liability and purports to apply Title IX standards to student conduct[5] – except with the University's addition of "continuing adverse effects" which conflicts with its incorporation of Title IX into its Policy.

As discussed above, the Title IX statute prohibits conduct so severe and pervasive as to effectively bar the victim's access to an educational opportunity or benefit, where the university exercises substantial control over both the harasser and the context in which the known harassment occurs. Therefore, and pursuant to its adoption of the

---

[5] Similarly, with regard to its jurisdiction over "Third Parties," the University's Title IX Policy caveats that "[t]he University's ability to take appropriate corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University. The Title IX Coordinator will determine the appropriate manner of resolution consistent with the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this policy." ECF No. 3-2, Pageid# 52.

statute into its policy, the University's Title IX Policy limits its jurisdiction over certain persons and specifies conditions that trigger Prohibited Conduct, all related to this exercise of substantial control over person and place.

The University has promulgated a set of regulations, its Procedures, to be read together with the Policy. ECF No. 3-3. The Procedures, like the Policy, incorporate the contours of liability standards under Title IX. The Procedures emphasize, and specifically provide, that: "Although a report may be re-opened at any time, the University will only be able to *pursue disciplinary resolution and sanctions* where the Respondent *continues to be* a University 'Student' (i.e., continues to be registered or enrolled for credit- or non-credit-bearing coursework at the University)." (Emphasis added). Both the Title IX statute and the University's Policy confine the scope of prohibited conduct based on control over the "offender." The University's Policy confines the scope in its incorporation of the Federal Title IX statute and by express language.

II.     The Defendants failed to ensure a prompt and equitable investigation.

Here, the departures from the stated Procedures providing for due process are substantial. Mr. Doe did not know on May 1, 2019, when the University decided to withhold his degree, that in the two days prior, Defendant Flood had collected new information not included in the Draft Investigation Report ("Draft Report"). On April 30, 2019, Defendant Flood interviewed the complainant's friend, whose name was previously identified, in full, in another witness interview occurring earlier in September 2018. On April 29, 2019, Defendant Flood also engaged in e-mail correspondence with the

complainant, receiving cellular call (but not text message) records directly from her, even though the complainant had been interviewed in August 2018 and had raised the issue of her cell phone use then. Mr. Doe was not informed of these developments in the May 1, 2019, notice issued by Defendant Babb and had no opportunity to submit evidence in response. Also, at this time, Mr. Doe did not know that the University apparently intended to omit Mr. Doe's Supplemental Affidavit and Response in its Final Report. While the Final Report omits Mr. Doe's Supplemental Affidavit and Response, it includes the complainant's response in full.

In the section finding Mr. Doe responsible for Sexual Assault under the Title IX Policy, the Final Report relies heavily on the information gathered on April 29, 2019, and April 30, 2019, and to which only the complainant was privy. Mr. Doe never had an opportunity to respond to the information prior to being found responsible for Sexual Assault on May 22, 2019. Mr. Doe was not afforded a meaningful opportunity to present a defense prior to the withholding of his diploma, apparently on the basis of this "new" information, or to present his defense to this information prior to being found responsible for Sexual Assault in the May 22, 2019, Final Report. *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 619 (E.D. Va. 2016), citing *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961).

From the Notice to the Review Panel Hearing, 60 days should elapse, except for good cause shown and where the parties are noticed of that fact. The investigation lasted five times longer than the Procedures provide. The investigation commenced on August 8, 2018. The Draft Report was not issued until December 18, 2018. Exhibit 1 at ¶ 12.

The Final Report was not issued until May 22, 2019. *Id.* at ¶ 29. The Review Panel

Hearing was scheduled on June 5, 2019, for July 1, 2019. *Id.* at ¶ 36. During that period,

Mr. Doe was provided with only a single notice of delay on October 8, 2018. *Id.* at ¶ 10.

The notification stated that Defendant Flood required additional time to issue the Draft

Report. *Id.* When the Draft Report was issued over two months later, on December 18,

2018, the last dated piece of evidence within the Draft Report was an interview

conducted on October 12, 2018, four days after the issuance of the notice of delay. When

the Final Report was issued on May 22, 2019, it included "new" information that was in

fact available to Defendant Flood and the complainant when the investigation began: a

witness whose identity was given to Defendant Flood in September 2018 and

complainant's phone records. *Id.* at ¶ 33.

An *ex parte* communication between an adversary and the decision-maker offends

due process when notice is not given; because without notice, the party cannot respond to

it. The prohibition against *ex parte* communications is a function of the general due

process principle that an accused should have notice of the charges and the evidence

against him so that he can effectively answer with his own evidence and arguments. *See*

*Wolff v. McDonnell,* 418 U.S. 539, 563, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Vitarelli*

*v. Seaton*, 359 U.S. 535, 541, 3 L. Ed. 2d 1012, 79 S. Ct. 968 (1959); *Sullivan v.*

*Department of the Navy*, 720 F.2d 1266, 1271-1272 (Fed. Cir. 1983). In the student

misconduct context, that means equal access to the evidence in order to have an equal

chance to respond. If the decision-maker considers charges or evidence which have come

to it *ex parte*, *i.e.*, without notice and an opportunity to respond, due process is violated. *Sullivan*, 720 F.2d at 1274.

The Final Report relies heavily on the "new" information gathered by Defendant Flood to find Mr. Doe responsible for Sexual Assault.  ECF No. 6-1.  Both sets of information are emphasized in the last section of the Final Report finding Mr. Doe responsible for allegedly having non-consensual sex with Ms. Roe.  The complainant had access to this information – the cellular telephone records were hers, and the witness described herself as a current friend of the complainant.  Mr. Doe's inability to know of, or respond to, this "new" information developed *ex parte* with the complainant, contributed substantially to the erroneous finding of responsibility in the Final Report. Now, Mr. Doe is in a position of having to "dig himself out of" a Final Report where he did not have an equal opportunity to be heard.

III.    The Defendants deprived Mr. Doe of property and liberty interests without any pre-or prompt post-deprivation hearing.

On May 1, 2019, after the investigation had been pending for ten months, Defendant Babb, the Title IX Coordinator, e-mailed Mr. Doe and informed him that the University was withholding his degree.  *See* Exhibit 1 at ¶ 24. The e-mail did not contain any notice of a prompt post-deprivation hearing or justification for deciding to withhold the degree without a prior hearing.  On this date, Mr. Doe had not been found in violation of any provision of the Title IX Policy.  He had not heard anything from the University since February 13, 2019, when Defendant Flood confirmed receipt of Mr. Doe's February 13, 2019, Supplemental Affidavit and Response.  *Id.* at ¶ 21. Defendant Babb's e-mail of

May 1, 2019, did not indicate when the proceedings would be concluded, nor did it set any date upon which Mr. Doe could be heard. *Id.* at ¶ 24. There was no notice of the reasons for the delays that had occurred since February 2019, and were occurring, in the resolution of his case.

On May 28, 2019, Mr. Doe filed his objections with the University, challenging not only the finding in the Final Report, but also the process to which he was subjected. ECF No. 3-5 and Exhibit 1 at ¶ 35. Among other items, Mr. Doe stated he did not have an equal opportunity to be heard in the investigation and asserted that the University had no grounds for jurisdiction to pursue disciplinary action against him. In response to his objections, Defendant Babb began making arrangements to schedule the Review Panel Hearing. ECF No. 3-6 and Exhibit 1 at ¶ 36.

Students who are suspended, even briefly, are to be afforded an opportunity to be heard. *See Goss v. Lopez*, 419 U.S. 565, 576, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975) (student owed opportunity to be heard for 10-day suspension from public school). Students who are a danger to the school may be suspended immediately. *Id.* When there is no pre-deprivation hearing, the post-deprivation hearing must be "prompt." Even a delay of even a few days has been enough for a constitutional violation. *See Mackey v. Montrym,* 443 U.S. 1, 3, 99 S. Ct. 2612, 2613, 61 L. Ed. 2d 321, 325 (1979) (state statute was constitutional because driver with suspended license had immediate right to hearing before the registrar of motor vehicles); *Barry v. Barchi*, 443 U.S. 55, 61 L. Ed. 2d 365, 99 S. Ct. 2642 (1979) (horse trainer's license suspended for 15 days; the trainer's suspension was unconstitutional for lack of assurance of a prompt post-suspension hearing);

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494, 505 (1985) (if the first stage hearing cannot come before the deprivation, the government should suspend the employee *with* pay).

Defendants should never have withheld Mr. Doe's degree without a hearing, and doing so violates due process. Even when exigent circumstances exist to summarily deprive an individual of their property or liberty interests, a prompt, meaningful, opportunity to be heard must occur very soon after the deprivation. Neither a pre- or post- deprivation hearing was afforded Mr. Doe.

IV.    Conclusion.

The Defendants substantially violated their own policy and procedures, including those aspects that guarantee fundamental constitutional due process. The most flagrant violation deprived Mr. Doe of any opportunity to address the basic jurisdictional question – whether the University properly exercises authority in his case to pursue disciplinary action or sanctions – and deprived Mr. Doe of any opportunity to be heard on governmental action that deprived him of his degree, a substantial property interest. In response, the Defendants adopt an interpretation of their own Policy inconsistent with its plain language and unsupported by federal statute, regulations, and cases interpreting Title IX. The Defendants' extreme interpretation of their Policy and absolute insistence on subjecting Mr. Doe to further disciplinary proceedings, require this Court to grant Mr. Doe the relief he seeks. Absent this Court's intervention, Mr. Doe will be arbitrarily subjected to a process that threatens substantial liberty and property interests in violation of the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiff John Doe respectfully requests that his remaining request for relief in his Motion for a Preliminary Injunction be granted, that the Court enter an order prohibiting the Defendants from pursuing further disciplinary resolution or sanctions, and order Defendants to confer his degree effective the date it was scheduled to be conferred, pending further proceedings of this Court, and for all other relief the Court deems proper and appropriate.

JOHN DOE

By counsel

ST. JOHN, BOWLING, LAWRENCE & QUAGLIANA, LLP

By:    */s/Rhonda Quagliana*
        Rhonda Quagliana (VSB# 39522)
        Francesca E. Fornari (VSB#70989)
        416 Park Street
        Charlottesville, Virginia 22902
        (434) 296-7138
        Facsimile: (434) 296-1301
        rq@stlawva.com
        fef@stlawva.com
        Counsel for Plaintiff John Doe

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 19, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: counsel of record; and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

*/s/ Rhonda Quagliana*
