## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:19-CV-00038-GEC** |
| | ) | |
| **RECTOR AND VISITORS OF THE** | ) | |
| **UNIVERSITY OF VIRGINIA, ET AL.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT UNIVERSITY OF VIRGINIA'S
## SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Defendant Rector and Visitors of the University of Virginia (University) and the individual Defendants, by counsel, pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully request that this Court deny Plaintiff's motion for injunctive relief and permit the University to move forward and complete the student's disciplinary proceedings involving Mr. Doe. The University incorporates by reference its prior Memorandum in Opposition to Plaintiff's Motion. (Doc. 6).

## I. Preliminary Statement

The University issued a Notice of Investigation to Plaintiff on August 8, 2018 under its Title IX Policy. Joint Stip. ¶ 1 (Doc. 45; pageid# 326-27). At that time, Plaintiff was a University student who was registered and enrolled at the University. The Notice of Investigation notified Plaintiff that the University was initiating an investigation for sexual assault and sexual harassment, incorporated the Title IX Procedures, outlined the investigation and adjudication process, and identified the potential sanctions for the reported Prohibited

Conduct. Id. The reported sexual assault by Plaintiff occurred in April 2017. At the time the reported sexual assault occurred (April 2017), Plaintiff was a University student who was registered and enrolled at the University. Pl. Compl. ¶ 38 (Doc. 1; pageid# 9). Plaintiff's contention that the University somehow lost authority to investigate, adjudicate, and sanction Plaintiff, if found responsible, for misconduct Plaintiff allegedly committed while he was an enrolled student and based on an investigation that commenced while he was an enrolled student, because he completed the academic requirements necessary to obtain a University degree pending resolution, finds no support from the University's Title IX policy. Moreover, Plaintiff's proffered construction of the Title IX Policy results in an inconsistent application of the University's Title IX Policy to students, employees, and third parties. It also is contrary to thie Court's prior decisions interpreting the scope of the University's disciplinary authority.

At the time an investigation is commenced, the Title IX Coordinator and the Evaluation Panel determine (1) whether the reported misconduct, if substantiated, would constitute Prohibited Conduct under the Title IX policy, and (2) whether the University has authority over the individual identified as the Respondent. This determination looks at both the status of the respondent at the time the alleged Prohibited Conduct occurred and his/her status at the time the investigation is commenced. The Title IX Policy is written and intended to have a broad scope and to reach not only Prohibited Conduct by and against "Students" and "Employees," but also Prohibited Conduct committed by and against "Third Parties." The Title IX Policy and Procedures acknowledge that the scope of available remedies may be impacted by the nature of the relationship between a respondent and the University, but nowhere do they state or imply that the University's authority over individuals will expire because a respondent may voluntarily (or involuntarily) sever his/her relationship with the University while an investigation is pending.

2

Plaintiff's interpretation also would create a perverse incentive and virtually no recourse for those respondents who commit a Title IX offense shortly before their graduation. Importantly, the University has consistently applied its Title IX Policy in this way – continuing to investigate and adjudicate reports of Prohibited Conduct that arose while an individual was a student or employee even if that relationship ends during the pendency of the investigation. The University's application of its Title IX Policy and Procedures to Plaintiff is supported not only by the language of the University's documents and its consistent practices, but also by prior decisions of this Court that have construed the University's authority over former students. See, e.g., Padula v. Rector & Visitors of the Univ. of Va., Civil Action No. 3:98CV00047 (W.D.Va. June 24, 1998) (attached); Doe v. Ackerly, et al., Civil Action Nos. 3:02CV00030 & 3:02CV00031 (W.D.Va. Mar. 21, 2002) (attached). Most importantly, there is nothing constitutionally impermissible about the University's policy decision to interpret and apply its disciplinary rules consistently in this way.

Plaintiff also seeks to buttress his entitlement to injunctive relief by alleging various procedural irregularities in the University's process. But it is well settled that to obtain the extraordinary injunctive relief he seeks, Plaintiff must demonstrate that the University's Title IX Policy violates due process. That is, Plaintiff must establish more than a contested departure from the University's Title IX Policy, but a constitutional violation. Plaintiff has failed to do so in this case. The Court therefore should deny his request for injunctive relief and permit the University to conclude its disciplinary process involving Plaintiff.

## II. Standard of Review

This Court is familiar with the well-settled standard Plaintiff must meet to obtain an extraordinary remedy of preliminary injunctive relief. See Winter v. Nat. Res. Def. Council,

Inc., 555 U.S. 7, 20 (2008). Preliminary injunctive relief is an "extraordinary" remedy that should be granted sparingly and only in limited circumstances. In re Microsoft Corp. Antitrust Lit., 333 F.3d 517, 526 (4th Cir. 2003). As a "condition precedent" to preliminary injunctive relief, Plaintiff must show that the relief is necessary "to prevent harm that is both irreparable and immediate." Direx Israel, Ltd. V. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) ("[T]he required 'irreparable harm' must be neither remote nor speculative, but actual and imminent.") The Court engages in a four-factor balancing test to determine whether to grant the requested relief. In re Microsoft, 333 F.3d at 527. Those four factors are: (1) the likelihood of irreparable harm to the Plaintiff if the requested relief is not granted; (2) the likelihood of harm to the defendant if the relief is granted; (3) the likelihood that Plaintiff will succeed on the merits; and (4) the public interest. Id.; Direx Israel Ltd., 952 F.2d at 811. Plaintiff bears the burden of establishing that each of the four factors supports granting an injunction. Direx Israel Ltd., 952 F.2d at 812. Moreover, Plaintiff must make a "clear showing" he is entitled to relief. Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009) vacated on other grounds by 130 S. Ct. 2371 (2010) reaffirmed, in part, on reconsideration by 607 F.3d 355 (4th Cir. 2010). This clear showing requires all four requirements to be satisfied. Id.

Plaintiff also continues to ignore the material distinction between a prohibitive and a mandatory injunction. Plaintiff does not merely ask this Court to maintain the status quo, he requests that this Court direct the University to confer an academic degree. But "when the preliminary injunction is 'mandatory rather than prohibitory in nature,' this Court's 'application of this exacting standard of review is even more searching.'" In re Microsoft, 333 F.3d at 525. This Court's authority "to issue a preliminary injunction especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation

demand such relief." Wetzel v. Edwards, 635 F. 2d 283, 286 (4th Cir. 1980). Plaintiff has not satisfied the more exacting standard which would be required to compel the University to issue a degree while its disciplinary process remains pending. See Doe v. George Washington Univ., 305 F. Supp. 126 (D.D.C. 2018) (denying plaintiff's motion for injunctive relief to enjoin suspension and confer degree following finding of responsibility for sexual assault).

### III. Argument

The University's Title IX process occurs under one of three student disciplinary systems which, in combination, are intended by the University to address a broad scope of student misconduct that occurs on and off-Grounds. The University's Honor Code applies to lying, cheating, or stealing, that occurs on and off-Grounds. The University's Standards of Conduct (prohibiting physical assaults, intentional or reckless threats to health or safety, disruption, disorderly conduct, property damage, etc.) applies to student misconduct that occurs on or off-Grounds. And the University's Title IX Policy (prohibiting sexual or gender-based harassment, sexual assault, stalking, intimate partner violence, etc.) applies to misconduct specifically of a sexual or gender-based nature that occurs on or off-Grounds. Like the University's Honor Code and its Standards of Conduct, the University's Title IX Policy addresses a wide spectrum of misconduct.

The University's Title IX Policy generally "prohibits Sexual Assault, Sexual Exploitation, Intimate Partner Violence, Stalking, Sexual or Gender-Based Harassment, Complicity in the commission of any act prohibited by this policy, and Retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this policy (collectively, 'Prohibited Conduct'). These forms of Prohibited Conduct are unlawful, undermine the character and purpose of the

University, and will not be tolerated." Joint Stip. Ex. 3 (Doc. 45-3; pageid# 340-41). The University's Title IX Policy thus intends to reach the broadest possible spectrum of sexual or gender-based misconduct that may impact the University's programs and its students, faculty, staff, and third parties. The Title IX Policy expressly applies to misconduct "by or against" Students, Employees, and Third Parties. Joint Stip. Ex. 3 (Doc. 45-3; pageid# 341). The Title IX policy expressly applies to misconduct that occurs on Grounds; that occurs in the context of University employment, program, or activity; and to misconduct that occurs off Grounds, and outside of University employment, program, or activity, if the misconduct (1) has continuing adverse effects on, or (2) creates a hostile environment for Students, Employees, or Third Parties on Grounds or in University employment, program, or activity. Joint Stip. Ex. 3 (Doc. 45-3; pageid# 341-42).

The University has concluded that a student's commission of a sexual assault occurring off-Grounds, if substantiated by a preponderance of the evidence, has a "continuing adverse effect" on other University students, programs, and activities. Plaintiff contends that the University's interpretation of its Title IX Policy is "so extreme as to be a violation of due process" and therefore is constitutionally impermissible. Plaintiff cites no precedent suggesting that the University's interpretation of its Title IX Policy – i.e., that it has authority to investigate and, if appropriate, sanction a student's commission of a sexual assault occurring within miles of the University's Grounds – is "extreme" or constitutionally impermissible. This Court's prior decisions provide the University broad authority to investigate, adjudicate and punish student misconduct – even after that student completes the academic requirements necessary to obtain a degree.

The University respectfully submits the same outcome should follow in this case and the Court should deny Plaintiff's request for injunctive relief, permitting the University to proceed and to conclude its disciplinary process involving Plaintiff.

A.     The University Has Authority to Adjudicate a Student's Misconduct that Occurred While He Was a Student – Even After the Student Separates from the University.

For nearly twenty years, this Court has affirmed the University's authority to investigate and adjudicate misconduct that was committed while a student was enrolled, even after the student has completed the requirements necessary to graduate.  See Goodreau v. Rector & Visitors of the Univ. of Va., 116 F.Supp.2d 694 (W.D.Va. 2000) (granting University's motion for summary judgment on plaintiff's declaratory judgement claim and holding that University has implied power to revoke the degree of former student).  In Goodreau, a student reportedly stole money, but the theft went undetected until after the student had graduated and received his degree.  See id. at 698.  After the theft was discovered, the student was reported to the police and to the University's Honor Committee.  After protracted proceedings before the University's Honor Committee, the University's General Faculty ultimately revoked the student's degree eight years after he had graduated from the University.  See id. at 699.  Affirming the University's authority and its power to revoke a degree of a former student for misconduct committed while a student, this Court recognized that "degree revocation is reasonably necessary to effectuate the Board's power to confer degrees and to regulate student discipline . . ."  Id. at 703 (emphasis supplied).  This Court reasoned that the University's degree is a "certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards."  Id. (emphasis supplied) (quoting Waliga v. Board of Trustees of Kent State Univ., 488 N.E.2d 850, 852-53 (Ohio 1986)).  As in Goodreau, the University's conferral of a degree to Mr. Doe in this case would be its certification that Doe not only completed the academic

requirements necessary to graduate, but also that he complied with the University's standards while a student, including compliance with the Title IX Policy prohibiting sexual assault – a determination that the University has not yet made, because its Title IX process has not yet concluded.  Importantly, this Court in Goodreau recognized that the University's authority and its power to sanction former students was not limited only to academic misconduct, but included violations of other institutional standards such as theft.  Id. at 703 (stating "the fact that these [cited] cases all dealt with academic misconduct, as opposed to a disciplinary infraction such as the one involved in the present case, does not weaken their value as authority, for the rationale set forth in those opinions also applies to the University's ability to revoke a degree for a violation of the Honor System.")  Accord Greene v. University of Va., Civil Action No. 3:00CV0006 (W.D.Va. Apr. 17, 2000) (dismissing plaintiff's claim as time barred where University revoked plaintiff's degree three years after graduation for writing bad checks while she was a student) (attached).  The University's authority over Plaintiff in this case is even stronger than in Goodreau, where the University already commenced its investigation while Plaintiff was a student and before he completed the academic requirements to obtain a degree.  As Plaintiff concedes, he was on notice during most of his fourth year that he was under investigation for sexual assault and the nature of the penalties that could be imposed if he was found responsible for that Prohibited Conduct.

In a case strikingly similar to this one, this Court denied injunctive relief to prevent the initiation and conclusion of student disciplinary proceedings against two former University students.  See Doe v. Ackerly, et al., Civil Action Nos. 3:02CV00030 & 3:02CV00031 (W.D.Va. Mar. 21, 2002) (attached).  In Doe, two former University students sought injunctive relief to prevent disciplinary proceedings by the University's Honor Committee from moving forward.

One former student (John Doe) previously had graduated from the University and received his degree.  Id. at 2.  The other former student (Jane Doe) had transferred to another institution.  Id. Although the alleged offenses occurred when they were students at the University, both students argued that the University's Honor Committee lacked jurisdiction to adjudicate the claims against them because they no longer were students at the University at the time of the proceedings.  Id. at 2-4.  Plaintiff Jane Doe specifically argued that because the Honor Committee By-Laws did not explicitly extend to a former student, the Honor proceedings against her should be enjoined.  Rejecting Jane Doe's request for injunctive relief, this Court reasoned that Jane Doe relied on a "dubious interpretation" of a single provision in the Honor Committee's By-laws that she read in isolation and that she did not take into account other By-Laws provisions.

Similarly, in this case, Plaintiff demands a cabined interpretation of the scope of the Title IX Policy.  Plaintiff's interpretation creates internal inconsistency within the Title IX Policy. Plaintiff's interpretation also is inconsistent with the larger student disciplinary system and policies governing student misconduct at the University.

Plaintiff's argument regarding the University's authority over Doe fails to acknowledge that the University's Title IX Policy on its face reaches beyond current Students and Employees and also applies to Prohibited Conduct committed by and against "Third Parties."

> This policy applies to Students who are registered or enrolled for credit- or non-credit-bearing coursework ("Students"); University employees, consisting of all full-time and part-time faculty, University Staff, Medical Center employees and classified staff, wage (including temps), professional research staff, and post-doctoral fellows ("Employees"); and contractors, vendors, visitors, guests or other third parties ("Third Parties").  This policy pertains to acts of Prohibited Conduct committed by or against Students, Employees and Third Parties . . .

Joint Stip. Ex. 3 (Doc. 45-3; pageid# 341). The fact that the University's Title IX Policy expressly covers not only Students and Employees, but also Third Parties, undercuts Plaintiff's contention that the University by and through the Title IX Policy somehow ceases to have authority over Plaintiff for misconduct reportedly committed while he was a student after he completed his degree requirements. Thus, even if this Court were to adopt Plaintiff's constrained reading of the University's Title IX Policy, the University nonetheless would retain authority to adjudicate the report of Prohibited Conduct against Doe as a "Third Party" under the Title IX Policy. See Id. (pageid# 342). ("Third Parties who commit Prohibited Conduct may have their relationships with the University terminated and/or their privileges of being on University premises withdrawn."); Id. (pageid# 343) ("The University's ability to take corrective action against a Third Party will be determined by the nature of the relationship of the Third Party to the University.") Id. (pageid# 349) ("There is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time . . . and Respondents may no longer be affiliated with the University.") (emphasis supplied). Importantly, while the Title IX Policy acknowledges that "the University's ability to respond may diminish," it does not state or even imply – as Plaintiff argues – that the University's ability to respond expires, terminates, or otherwise is extinguished. Thus, merely reclassifying himself from a "Student" to a "Third Party" does not extinguish the University's authority to investigate, adjudicate, and sanction, if appropriate, Plaintiff for sexual assault. And this Court's precedent makes clear that the University's continued authority to sanction Plaintiff, up to and including refusing to grant Plaintiff's degree for misconduct he committed while he was a student, is not a constitutional due process violation.

In the Doe cases, when rejecting John Doe's request for preliminary injunction, this Court also found that the University's established practice of construing and applying its governing documents supported its interpretation of the policy as to John Doe. Id. at 13 (noting "there is the longstanding and well-known practice of the Honor Committee to initiate proceedings against former students well after they have graduated.") While Title IX proceedings, like Honor proceedings, are confidential, Plaintiff has acknowledged in his Complaint a general awareness of the University's interpretation and application of the Title IX Policy in other cases. See Pl. Compl. ¶ 92 (Doc. 1; pageid# 20) (alleging what Plaintiff refers to as University's "pattern of misapplication of the Title IX Policy" – i.e., application of the Title IX Policy to students in similar factual settings as Plaintiff). Indeed, as in the Doe cases, the University's consistent interpretation and application of the Title IX Policy supports its application to Plaintiff in this case. The University has consistently applied the Title IX Policy, like its Judiciary and Honor policies, to Prohibited Conduct occurring off-Grounds. Babb Decl. ¶ 9. In the past two academic years, the University has initiated Formal Resolution under the Title IX Policy in 39 cases involving off-Grounds Prohibited Conduct. Id. During that same time, the University has initiated Formal Resolution under the Title IX Policy in 15 cases where a complainant was a Third Party, former student, or former employee. Id. Thus, the University's application of its Title IX Policy to Plaintiff's misconduct in the case is neither an aberration, nor an "extreme" one.

Similarly, just as it does in Judiciary and Honor proceedings, the University has continued to retain authority to investigate and adjudicate reports of Prohibited Conduct by students (and employees) who may separate from the University before their Review Panel proceedings have concluded. Babb Decl. ¶ 10. In the prior three academic years, the University

has issued 18 degree holds for students who were in a pending Formal Resolution pursuant to the Title IX Policy. Babb Decl. ¶ 10. While the University's Title IX Procedures acknowledge that the University's sanctions and corrective measures may be more limited after a student or employee ends his or her relationship with the institution, effective sanctions and protective measures remain available to the University even post-separation.[1] The University has imposed effective sanctions in prior Title IX cases involving former students. Babb Decl. ¶ 11 (identifying sanctions in other Title IX cases involving former students including expulsion, suspension of degree conferral for a specific period, prohibition from re-enrollment at the University, prohibition from attending Finals Exercises, and No Trespass Orders").[2] Thus, the University's consistent interpretation and application of its Title IX Policy are far from Plaintiff's suggestion that its application in his particular case is "so extreme as to be a violation of due process."

---

[1] With regard to available sanctions, the Title IX Procedures provide the following:

> The Policy prohibits a broad range of conduct, all of which is serious in nature. The propriety of any particular sanction is reviewed on an individual basis based on the unique facts and circumstances as found by the Review Panel. In keeping with the University's commitment to foster an environment that is safe, inclusive, and free from discrimination and harassment, the Policy provides the Review Panel with wide latitude in the imposition of sanctions tailored to the facts and circumstances of the Prohibited Conduct, the impact of the conduct on the Complainant and University community, and accountability by the Respondent. The imposition of sanctions is designed to eliminate the Prohibited Conduct, prevent its recurrence, and remedy its effects, while supporting the University's educational mission and legal obligations. Sanctions may include educational, restorative, rehabilitative, and punitive components. Some conduct, however, is so egregious in nature, harmful to the individuals involved or so deleterious to the educational process that it requires severe sanctions, including suspension or expulsion from the University.

Joint Stip. Ex. 4 (Doc. 45-4; pageid# 376-77) (emphasis supplied).

[2] The University also has a consistent interpretation and application of its Title IX Policy regarding employees who separate from the University before the conclusion of their pending Formal Resolution before a Review Panel. In such cases, the University has imposed sanctions against former employees including ineligibility for rehire, exclusion from certain post-

In the Doe cases, this Court identified the exact constitutional question: Did Plaintiff have notice that the University intended to proceed against him? Id. at 12. Consistent with this Court's reasoning in the Doe cases, from the time the University issued the Notice of Investigation against Plaintiff on August 8, 2018, Plaintiff was fully aware of the University's intent to investigate, adjudicate, and sanction , if appropriate, Plaintiff under the Title IX Policy. Indeed, the constitutional propriety of the University's application of its Title IX Policy to Plaintiff in this case is even stronger than the Doe cases, where the University has initiated its disciplinary process and put Plaintiff on notice while he still was a student that it intended to investigate and potentially sanction him.

Plaintiff contends that the University's conclusion – i.e., that Plaintiff's reported off Grounds sexual assault has "continuing adverse effects" on the University community – violates the Constitution. This is a novel theory and one that no doubt would be astonishing to thousands of parents who send their sons and daughters to the University assuming that consistent with the Title IX Policy, the University "is committed to providing a safe and non-discriminatory learning, living and working environment." See Joint Stip. Ex. 3 (Doc. 45-3; pageid# 340). Plaintiff's contention that the University may investigate and punish simple assault occurring off Grounds (pursuant to the Standards of Conduct) and petty theft occurring off Grounds (pursuant to the Honor System), but not investigate and punish sexual assault occurring off Grounds is both antithetical and strains credulity. In construing the Title IX Policy's "continuing adverse effects" nexus, the University is cognizant that the Title IX Policy prohibits a broad range of conduct and, while all of it is significant, some types of conduct may or may not have continuing adverse effects on the University community. If a preponderance of the evidence demonstrates, however,

employment benefits, and No Trespass Orders. Babb Decl. ¶ 11.

that Plaintiff committed a sexual assault off-Grounds, the University certainly should have the prerogative to determine at the time it commences an investigation that such egregious misconduct would have continuing adverse effects on the University community and fashion sanctions under the Title IX Policy that ameliorates those effects – in addition to holding the Plaintiff responsible for such conduct that he committed while he was a University student.

Plaintiff contends that since the University did not interim suspend him and he was allowed to continue participating in University activities while under investigation, that somehow forecloses the University's determination that his sexual assault, if established in the Review Panel proceeding, has a continuing adverse effect on the University community.[3] The Court should reject Plaintiff's post-incident behavior as a means of exempting himself from the application of the Title IX Policy. The University certainly has the authority to issue an interim suspension while a matter is being investigated – and it has done so in appropriate cases. Babb Decl. ¶¶ 12-15. Even though interim suspensions are deemed to be non-punitive, they nonetheless have a significant impact on a respondent – who is denied the opportunity to continue attendance at the University before a finding of responsibility has occurred. The University's Title IX Policy provides that Plaintiff (and all respondents) are presumed to be not responsible for Prohibited Conduct unless and until a preponderance of the evidence demonstrates otherwise. See Joint Stip. Ex. 4 (Doc. 45-4; pageid #369) ("The Respondent is presumed to be not responsible; this presumption may be overcome only where the Investigator and/or Review Panel conclude that there is sufficient evidence, by a Preponderance of the

---

[3] Plaintiff submits that his alleged misconduct did not have any continuing adverse effects on the University community because he was not reported for any additional misbehavior while the investigation was pending. But Plaintiff cannot exempt himself from the scope of the University's Title IX Policy merely by being on "good behavior" while he is subject to an on-going investigation for sexual assault.

Evidence, to support a finding that the Respondent violated the Policy.").    The University in each case engages in lengthy multi-factor analysis to determine whether and, if so, which interim protective measures are necessary.  Babb Decl. ¶¶ 12-13.  The University has the power to impose an interim suspension in cases that warrant such an interim measure, but because of the presumption of non-responsibility and because no investigation has yet occurred at the Evaluation Panel stage, the University seeks to limit the application of the pre-investigation interim suspension to only those cases that absolutely require it.  Babb Decl. ¶ 15.  In the past two-and-one-half years, the University has interim suspended seven students who were respondents in a pending formal resolution.  Id.  Of those, five students ultimately were expelled from the University at the conclusion of disciplinary process.  Id.  More importantly, however, nothing in the University's Title IX Policy or in the University's consistent application of its policy, ever has indicated or suggested to Plaintiff (or any other respondent) that the University somehow will lose authority to adjudicate reports of Prohibited Conduct against them simply because the University did not impose more drastic interim protective measures, such as an interim suspension.  Babb Decl. ¶ 14.[4]

Finally, Plaintiff contends that he has not – and will not – have an adequate opportunity to be heard on his assertion that the University lacks authority over him.  The procedural history of this case rebuts Plaintiff's argument in two ways.  Plaintiff was notified on August 8, 2018,

---

[4] Although Plaintiff's supplemental affidavit and memorandum continue to conflate interim "remedial" and "protective" measures, they have distinct meanings under the University's Title IX Policy and Procedures.  Interim "remedial" measures are those directed to the complainant to alleviate the immediate impact of the reported Prohibited Conduct while the investigation occurs. Interim "protective" are those directed to the Respondent to reduce the likelihood of continued acts of Prohibited Conduct.  In a case such as this one, where the reported misconduct was targeted to an unaffiliated person, the University's Evaluation Panel appropriately determined that interim suspension, imposition of a No Contact Order (which is enforceable only on-Grounds), or temporary modification of Plaintiff's class schedule was not necessary.

regarding the scope of the University's investigation against him which included sexual assault and sexual harassment. See Joint Stip. Ex. 2 (Doc. 45-2; pageid# 334) ("This report raises potential policy violations under the University's [Title IX Policy] for: Sexual Assault and Sexual Harassment"). During the course of the investigation, however, the University's Title IX Investigator determined that the reported sexual harassment was not within the scope of the Title IX Policy. Accordingly, when the University issued the Draft Investigation Report to the parties, it notified them that no further investigation of the sexual harassment allegation would occur and the investigation would proceed only on the sexual assault report. This determination was reconfirmed in the Final Investigation Report. See Final Investigation Report at 2 n.3 (Doc. 7-2) ("In the Draft Investigation Report issued on December 18, 2018, both parties were notified that the Investigator determined that the Complainant was not a University student at the time of the alleged incident and based upon the Complainant's status as a third-party, could not be unreasonably interfered with, limited or deprived from participating in or benefiting from the University's education or employment programs and/or activities, as required by the Title IX Policy of Sexual Harassment.") Thus, contrary to Plaintiff's claim in this lawsuit, the University's Formal Resolution process not only is theoretically capable of reaching determinations of the scope of the Title IX Policy during the course of its proceedings, it did so in this case with regard to the allegation of sexual harassment by Plaintiff. Despite the Title IX Coordinator's determination regarding the sexual harassment allegation, however, the University continued to have authority to investigate the Plaintiff's reported sexual assault under the Title IX Policy. Plaintiff continued to be on notice when the Draft Investigation Report was issued in December 2018 and thereafter when the Final Investigation Report was issued in May 2019 that the University intended to proceed with the investigation and adjudication of Plaintiff's reported

sexual assault. Plaintiff curiously cites the University's determination on his sexual harassment claim as support for his need for injunctive relief when, in fact, it is just the opposite. The University's determination in the Draft Investigation Report that the Title IX Policy did not apply to the report of sexual harassment demonstrates that there were multiple opportunities for Plaintiff to raise – and for the University to consider – the scope and application of the Title IX Policy to the report of sexual assault by Plaintiff. When Plaintiff finally raised the applicability of the Title IX Policy in his response to the Final Investigation Report in May 2019, the University considered and rejected it. Babb Decl. ¶ 16.

After the University issued the Final Investigation Report recommending a finding that Plaintiff was responsible for a sexual assault committed while he was a student, Plaintiff asserted that the scope of the Title IX Policy did not reach his misconduct. See Joint Stip. Ex. 11 (Doc. 45-11; pageid# 401). In his May 28, 2019, letter to Ms. Babb, Plaintiff stated:

> 13. Finally, the University lacks jurisdiction over this matter under its own Policy. The Complainant is not affiliated with the University in any capacity, as the investigator wrote in the FIR. No other provision in the Policy confers jurisdiction over this matter.

Joint Stip. Ex. 11 (Doc. 45-11; pageid# 401). Ms. Babb considered Plaintiff's contention regarding the scope of the Title IX Policy and rejected it. Babb Decl. ¶ 16. She thereafter issued on June 5, 2019, the Notice of Hearing for Plaintiff's Review Panel. Id. Thus, Plaintiff's claim that he has been unable to adequately raise his objection regarding the scope of the Title IX Policy is not correct. Plaintiff's contention that he should get a "jury trial" (before the Review Panel) or some further "appeal" of Ms. Babb's determination to some higher authority does not constitute a violation of his substantive or procedural due process. The University evaluated the application of the Title IX Policy when it issued the Notice of Investigation in August 2018; it re-evaluated the application of the Title IX Policy when it issued the Draft Investigation Report

(in which it discontinued investigation of the sexual harassment claim) in December 2018; it re-evaluated the application of the Title IX Policy when it issued the Final Investigation Report (in which it recommended a finding of responsibility of sexual assault) in May 2019; and it re-evaluated the application of the Title IX Policy when Plaintiff objected to the application of the Policy in his response to the Final Investigation Report and it rejected Plaintiff's assertion when it issued the Notice of Review Panel Hearing on June 5, 2019.  Id.  Plaintiff, in essence, is seeking from this Court an "interlocutory appeal" of the University's determination – not because he has been prevented from raising an objection in violation of due process, but because he disagrees with the University's decision and its interpretation of its Title IX Policy.  This Court previously has declined to intercede in University disciplinary proceedings under such circumstances and it should decline to do so here.   See, e.g., Doe, Civil Action Nos. 3:02CV00030 & 3:02CV00031 (W.D.Va. Mar. 21, 2002) (denying plaintiffs' motion for injunctive relief to prevent conclusion of Honor proceedings against former students).

B.     The University's Departures from the Title IX Policy or Procedures
       Do Not Entitle Plaintiff to Injunctive Relief.

Plaintiff argues that the University's alleged violation of its procedural rules in processing Plaintiff's investigation require injunctive relief.  But in the prior Doe cases, this Court recognized the important distinction between an institution's alleged violation of its own procedures and a constitutional violation.  "Plaintiffs need to do more than merely demonstrate that the University violated its own procedures or rules."  Doe, Civil Action Nos. 3:02CV00030 & 3:02CV00031 at 13 (quoting Tigrett v. Rector & Visitors of the Univ. of Va., 137 F.Supp.2d 670, 677 (W.D.Va. 2001) (Tigrett II)).  "This Court has previously found that a violation of the Honor Committee's by-laws is not necessarily a violation of constitutional due process, even if the by-laws confer a procedural right."  Id. (quoting Tigrett v. Rector & Visitors of the Univ. of

Va., 97 F.Supp2d 752, 758 (W.D.Va. 2000) (<u>Tigrett I</u>)).  Thus, "[i]n the Fourth Circuit, 'not every departure from a state agency's stated or customary procedures constitutes a denial of constitutionally guaranteed procedural due process . . . Indeed, the fundamental principle seems now established that in these cases the source of procedural guarantees is to be found solely in the due process clause rather than in any specific procedures provided by the state.'" <u>Id.</u> at 13-14 (<u>quoting</u> <u>Jones v. Board of Gov'rs of Univ. of N.C.</u>, 704 F.2d 713, 716-17 (4th Cir. 1983)).

Plaintiff argues that the length of the University's proceedings or its delay in rendering a final outcome somehow deprive the University of authority to conclude its Title IX process. This Court previously has rejected the same contention in the context of a student disciplinary proceeding.  <u>See</u> <u>Padula v. Rector & Visitors of Univ. of Va.</u>, Civil Action No. 3:98CV00047 (W.D.Va. June 24, 1998) (denying motion for preliminary injunction to compel conferral of degree where student's disciplinary process spanned more than one year and student had completed degree requirements) (attached).  "While this result is unfortunate, the delays themselves, absent evidence that they prejudiced [plaintiff's] ability to argue her case, do not constitute constitutional violations."  <u>Id.</u> at n.9 ("A 9-month adjudication is not, of course, unconstitutionally lengthy <u>per se</u>. . . . The chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait, does not state a claim of a constitutional violation.") (quoting <u>Cleveland Bd. of Educ. V. Loudermill</u>, 470 U.S. 532, 547 (1985)).  The University's investigation of Plaintiff commenced on August 8, 2018.  The Review Panel Hearing which would have concluded the University's process was scheduled to occur on July 1, 2019.  The time period of this investigation is longer than that in which the University strives to complete its adjudicatory processes, but it does not constitute a constitutional violation

entitling Plaintiff to injunctive relief that would short-circuit the University's adjudication of a sexual assault allegation.

Additionally, Plaintiff claims that he has not (or will not) have an adequate opportunity to respond to "new" information contained in the Final Investigation Report (FIR). See Compl. ¶ 8 (Doc. 1; pageid# 3) ("Mr. Doe was provided no opportunity to respond to the additional information . . ."); ¶ 62 (pageid# 12) ("was not provided an opportunity to respond . . ."). That is not correct. Plaintiff has at least two opportunities to respond to the FIR under the Title IX Procedures – he can (and did) file a statement contesting the findings and conclusions in the FIR. See Joint Stip. Ex 11 (Doc. 45-11; pageid# 400-02). Plaintiff also has a right to appear before the Review Panel to challenge the findings and conclusions in the FIR. Plaintiff already has availed himself of the first opportunity to be heard. After the FIR was issued, Plaintiff filed a response to the FIR in which he disputes the analysis and conclusions in the Final Investigation Report. See Id.

Plaintiff's continued request to have this Court intercede in the nearly concluded Title IX process actually would prevent Plaintiff (and the Complainant Jane Roe) from having their opportunity to be heard before the Review Panel regarding the findings and conclusions in the Final Investigation Report. Under the Title IX Procedures, the Review Panel is charged with reviewing the entire record[5] and holding a hearing:

---

[5] Contrary to Plaintiff's assertions, Plaintiff has not been prejudiced in any way by the inadvertent failure to attach Plaintiff's Supplemental Response and Supplemental Affidavit to the Final Investigation Report (FIR). On January 25, 2019, Investigator Flood received Plaintiff's initial response to the Draft Investigation Report (DIR) and Plaintiff's Affidavit. Flood Decl. ¶ 8. On February 13, 2019, Investigator Flood received Plaintiff's Supplemental Response to the DIR and Plaintiff's Supplemental Affidavit. Id. Investigator Flood considered all of Plaintiff's submissions before reaching his recommended findings in the FIR. Flood Decl. ¶ 8. Investigator Flood attached to the Final Investigation Report, Plaintiff's initial response to the DIR and Plaintiff's Affidavit. See Flood Decl. ¶ 9. But Investigator Flood inadvertently did not

to determine (1) whether the concerns stated by the contesting party raise substantial doubt about the thoroughness, fairness and/or impartiality of the investigation; and, if not, (2) whether there is sufficient evidence to support the Investigator's recommended finding(s) by a Preponderance of the Evidence.

\*       \*       \*

The Hearing is an opportunity for the parties to address the Review Panel, in person about issues relevant to the Standard of Review to be applied by the Review Panel. The parties may address any information in the Final Investigation Report, supplemental statements submitted in response to the Final Investigation Report, and any impact and mitigation statements. Each party has the opportunity to be heard, to identify witnesses for the Review Panel's consideration, and to respond to any questions of the Review Panel.

Joint Stip. Ex. 4 (Doc. 45-4; pageid# 374). Thus, Plaintiff's claims that he has not (and will not) have an adequate opportunity to be heard in response to all of the information contained in the Final Investigation Report simply are not true. That is the purpose of the Review Panel Hearing.

C.     The University's Title IX Policy is not Vague or Overbroad.

Plaintiff contends that the University's Title IX Policy, which gives the University authority to adjudicate conduct that occurs outside the context of University employment, programs, or activities but has "continuing adverse effects" on the University's students, employees, or third parties is unconstitutionally vague and overbroad. Pl. Suppl. Mem. at 14-17 (Doc. 46; pageid# 421-24). Plaintiff's argument is meritless.

---

attach to the FIR Plaintiff's Supplemental Response and his Supplemental Affidavit. Flood Decl. ¶ 9. Plaintiff has not been prejudiced by the inadvertent omission, and will not be prejudiced, because Plaintiff's supplemental materials can and will be supplied in the complete package of information submitted to the Review Panel before the Review Panel hearing. Flood Decl. ¶ 9. Accordingly, if this Court permits the University's process to move forward to conclusion, the Review Panel will have before it the full record. Moreover, as previously explained, Plaintiff will have an equal opportunity to appear before the Review Panel to present information relevant to the Panel's determination.

In Hirschkop v. Snead, 594 F.2d 356, 370-371 (4th Cir. 1979), on which Plaintiff relies heavily for his vagueness argument, the Fourth Circuit reviewed whether a disciplinary rule prohibiting a lawyer participating in a trial from making any statements about "other matters that are reasonably likely to interfere with a fair trial" was unconstitutionally vague in violation of the First Amendment. Unlike in the First Amendment context, however, the vagueness doctrine does not apply as rigidly in the school disciplinary context. See Smith v. Goguen, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts). In fact, the Supreme Court recognized that deference should be given to an educational institution when it came to the degree of specificity required in student disciplinary rules in light of the legitimate needs of the institution. Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986) ("We have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures . . . Given the school's need to be able to impose disciplinary sanctions for a wide variety of unanticipated conduct disruptive of the educational process, school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.") (internal citations and quotations omitted).

The University's policy regarding "continuing adverse effects" is similar to texts of a student discipline regulation that was upheld by the Fourth Circuit. In Collins v. Prince William Cnty. Sch. Bd., the Fourth Circuit upheld a district court's finding which rejected a vagueness challenge to a school regulation that granted the school authority to discipline students for offences occurring off campus that were "connected in any way with school, or have a detrimental effect on the school program." 142 Fed. App'x 144, 146-47 (4th Cir. 2005). Just as in Collins, the University's Title IX Policy is not void-for-vagueness as a reasonable University

student would have been on notice that committing a sexual assault in an off-Grounds apartment, so near the Grounds, would have continuing adverse effects on the University and on others on Grounds, thus subjecting him to the Title IX disciplinary process.

## **Conclusion**

For the reasons stated above, the Court should deny Plaintiff's request for injunctive relief and permit the University to complete its disciplinary process and adjudicate the report of sexual assault by Plaintiff

Date: August 2, 2019

Respectfully submitted,

**RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA, ET AL.**


By:    /s/ Barry T. Meek
                Counsel

Timothy J. Heaphy (VSB No. 68912)
University Counsel and
  Senior Assistant Attorney General

Barry T. Meek (VSB No. 41715)
Associate University Counsel and
  Senior Assistant Attorney General

Melissa Wolf Riley (VSB No. 43316)
Associate University Counsel and
  Assistant Attorney General

Jasmine Yoon (VSB No. 73542)
Associate University Counsel and
  Assistant Attorney General

Office of the University Counsel
University of Virginia
P.O. Box 400225
Charlottesville, Virginia 22904-4225

Telephone:    (434) 924-3586
Facsimile:    (434) 982-3070
E-mail:        bmeek@virginia.edu

**<u>CERTIFICATE</u>**

I hereby certify that on the 2nd day of August 2019, a true copy of the Defendant University of Virginia's Supplemental Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction was served by electronic means through the Court's CM/ECF system on counsel for Plaintiff as follows:

Rhonda Quagliana, Esq.
Francesca E. Fornari, Esq.
416 Park Street
Charlottesville, Virginia 22902
Telephone: (434) 296-7138
Facsimile: (434) 296-1301
Email: rq@stlawva.com
Email: fef@stlawva.com

Counsel for Plaintiff John Doe

**RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA, ET AL.**


/s/ Barry T. Meek