

ENTERED

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

MAR 2 1 2002

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JANE DOE ) | CIVIL ACTION NO. 3:02CV00030 |
| ) | CIVIL ACTION NO. 3:02CV00031 |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| JOHN P. ACKERLY, III, Rector of the ) | |
| University of Virginia, and ) | |
| THOMAS J. BLILEY, JR., ) | |
| CHARLES M. CARAVATI, JR., ) | |
| WILLIAM G. CRUTCHFIELD, JR, ) | |
| THOMAS F. FARRELL, II, ) | |
| CHARLES L. GLAZER, ) | |
| WILLIAM H. GOODWIN, JR., ) | |
| T. KEISTER GREER, ) | |
| ELSIE GOODWIN HOLLAND, ) | |
| GORDON F. RAINEY, JR., ) | |
| Individually and in their capacities as members of ) | |
| the Board of Visitors of the University of Virginia, ) | |
| ) | |
| Defendants. ) | |
| ) | MEMORANDUM OPINION |
| ) | |
| JOHN DOE ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| JOHN P. ACKERLY, III, Rector of the ) | |
| University of Virginia, ) | |
| and ) | |
| THOMAS J. BLILEY, JR., ) | |
| CHARLES M. CARAVATI, JR., ) | |
| WILLIAM G. CRUTCHFIELD, JR, ) | |
| THOMAS F. FARRELL, II, ) | |
| CHARLES L. GLAZER, ) | |
| WILLIAM H. GOODWIN, JR., ) | |
| T. KEISTER GREER, ) | |
| ELSIE GOODWIN HOLLAND, ) | |
| GORDON F. RAINEY, JR., ) | |
| Individually and in their capacities as members of ) | |
| the Board of Visitors of the University of Virginia, ) | |
| ) | |
| Defendants. ) | JUDGE NORMAN K. MOON |

I.

This matter is before the Court on Plaintiffs' motions to amend, Plaintiffs' motions for protective orders, and Plaintiffs' motions for temporary injunctions. Additionally, Defendants have filed a motion to dismiss in both cases. For the reasons stated below, Plaintiffs' motions to amend are GRANTED and Plaintiffs' motions for protective orders are GRANTED. Plaintiffs' motions for temporary injunctions, however, are DENIED. Defendants' motions to dismiss are DENIED.

Plaintiffs in this case are two individuals, John Doe and Jane Doe, who were undergraduate students at the University of Virginia. John Doe was enrolled from August 1996 until May 2000, at which time he graduated from the University and received his diploma. Jane Doe was a University student from August 2000 until January 2002, at which time she voluntarily transferred to another institution of higher education. Defendants are the Rector and Board of Visitors of the University of Virginia, who are named individually and in their official capacities with the University. The Board of Visitors exercises control over the student-run Honor Committee, which is at the center of these motions.

While students at the University, both plaintiffs enrolled in Physics 105, a course taught by Professor Louis Bloomfield. Professor Bloomfield, based on concerns that students in the large lecture course might have been cheating, developed a computer program to search for common phrases and sentences in almost two thousand term papers which had been turned in by students. In April 2001, based on the results from his computer program, Professor Bloomfield charged almost 150 current and former students with plagiarism. Each of the charges was

2

brought before the University of Virginia Honor Committee. Included in the list of charged

students and former students were the plaintiffs in this case. Plaintiffs insist, however, that in

proceeding against them the University's Honor Committee is violating both their constitutional

rights to due process, and their contractual rights with the University as contained in the Honor

Committee By-Laws and in the University's Undergraduate Record.

John Doe asserts that the Honor Committee lacks jurisdiction to hear his case because he

had already graduated at the time the initial charge by Professor Bloomfield was brought to the

Committee's attention. When he was first charged in April of 2001, the Committee's by-laws

defined a "student" as "any student who is registered, or intends to continue registration, in any

University sponsored educational activity. Also included in this category are former students

dismissed from the University for honor violations who are awaiting trial." Because John Doe

did not fit into this definition of student, the Honor Committee dismissed the charges against him

without proceeding with an investigation.

In September of 2001, however, the by-laws were amended, and the definition of student

was expanded to include any student who "was registered at the time of the alleged honor

offense." Under this amended definition, John Doe would qualify as a student. In a letter to

John Doe dated September 24, 2001, the Honor Committee explained that, "It has been the

Honor Committee's long-standing practice to pursue honor cases against graduates accused of

honor offenses committed prior to graduation," and that the amendment to the by-laws did not

change this practice, but simply clarified an existing practice. The letter concluded, "Following

our bylaw clarification, Professor Louis Bloomfield re-initiated his accusation, and we are

proceeding to review and manage his allegation in accordance with the current by-laws."

3

Jane Doe was a student at the time that charges were initiated against her in April of 2001. While under investigation but before being officially accused, Jane Doe elected to transfer out of the University Virginia. Under the Honor Committee by-laws, the entire process – initiation, investigation, trial, and post-trial – is to be conducted "in accordance with the most recent by-laws as of the date of initiation." Thus, Jane Doe argues that the 2000-2001 by-laws govern her case, even though she transferred out of the University in January of 2002, after the by-laws had been amended.

She argues that under the 2000-2001 by-laws, she does not qualify as a student because of a difference between an "investigated student" and an "accused student." The by-laws state that after an honor violation is alleged, the Honor Committee convenes an "Investigative Panel" to decide whether to formally accuse the student. During the Investigative Panel proceedings, the student is referred to as the "investigated student." If the Panel elects to accuse the student, then under the by-laws, "the student's status then changes to that of an "accused student." Essentially, Jane Doe argues that while the Honor Committee may have had jurisdiction over her as an investigated student, she never became an "accused student" because she left the University before being formally accused. She alleges that because she cannot meet the definition of an "accused student," that the Honor Committee lacks jurisdiction to consider the charges against her.

II.

Plaintiffs' first move to amend their complaints in order to clarify that Defendants are being made defendants in their representative capacities as members of the Board of Visitors of

4

the University and not solely as an official name for the University itself. Pursuant to Rule 15(a), leave to amend "shall be freely given when justice so requires." In addition, Defendants have not opposed Plaintiffs' motions. Therefore, the motions are granted and the title of the cases are renamed as stated above.

## III.

The Court next considers Plaintiffs' motions for a protective order. Plaintiffs seek leave of Court to proceed anonymously as Jane Doe and John Doe. It is within the Court's discretion whether to allow a party to proceed anonymously. *James v. Jacobson,* 6. F3d 233, 238 (4th Cir. 1993). Among the factors a court should consider in making this determination are:

1.  "whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation, or is to preserve privacy in a matter of sensitive and highly personal nature;"
2.  "whether the identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties;"
3.  "the ages of the persons whose privacy interests are sought to be protected;"
4.  "whether the action is against a governmental or private party; and;"
5.  "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously."

*Id.* The *Jacobson* court further explained that "privacy or confidentiality concerns are sometimes sufficiently critical that parties or witnesses should be allowed this rare dispensation." *Id.* For example, in *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983), both parties were permitted to proceed anonymously in order to protect confidential matters of attorney-client privilege. In that case, the former in-house counsel for a corporation brought an action against the corporation seeking benefits allegedly due him under the corporation's pension and life insurance plans. The court noted, "To prevent identification of the company and the possible disclosure of confidential

5

information concerning its affairs, the district court granted the defendant corporations motions to...require the suit to be prosecuted without revealing the name of either the lawyer or the corporation...." 709 F.2d at 1044 n.1.

Defendants contend that Plaintiffs should be forced to reveal themselves because their cases do not involve any of the questions that courts have traditionally treated with great sensitivity, such as birth control, abortion, the illegitimacy of a child, homosexuality, etc. They point out that "a plagiarism charge" does not rise to same level of intimacy as these other matters. However, as *Doe v. A Corp.* demonstrates, there are situations that involve sensitive matters worthy of anonymity that do not fall into the limited category of cases cited by Defendants. Furthermore, Plaintiffs do not insist that the charge of plagiarism, in and of itself, raises the kind of confidentiality concerns that warrant the granting of a motion to proceed anonymously. Rather, they focus on the procedures of the University's Honor Committee.

The Honor Committee by-laws guarantee anonymity throughout all stages of a proceeding. From the initiation, through the investigation, and during the trial, a student is never publicly named. Even after a trial is completed and a student is found guilty, the matter is handled discretely. The student is quietly asked to leave the University, and the euphemistic phrase "enrollment discontinued" is noted by the Registrar on the student's transcript.

With these public lawsuits, Plaintiffs assert that their constitutional due process rights are being violated by the University Honor Committee's insistence on proceeding against them. If they are not permitted to proceed anonymously, they would effectively be forced to choose to either: 1) continue with their legal claims and surrender the anonymity that the Honor Committee's by-laws afford to all accused individuals; or 2) abandon their constitutional claims

6

in order to retain their anonymity within the Honor Committee's setting.

This situation is analogous to the one faced by the parties in *Doe v. A Corp.* For that district court to deny the defendant corporation's motion would be to force the corporation to either pay the disputed benefits in order to protect confidential information, or to risk releasing sensitive material in order to defend its pension and life insurance plans. The court correctly surmised that it was better to permit the case to proceed anonymously rather than to place one party between rock and a hard place. Similarly, Plaintiffs should not be required to surrender their rights under the Honor Committee's proceedings in order to raise their constitutional claims.

If Plaintiffs had initiated these actions after the University had convicted them of honor offenses, their motions for protective orders would almost certainly be denied. In that situation, the Honor Committee's procedures would have been completed and Plaintiffs would no longer have the same level of interest in retaining the privacy that those procedures guarantee. In the present case, however, Plaintiffs attack the confidential process itself, not the result of that process. A protective order is therefore necessary to protect an essential aspect of the procedures – their anonymity – during a lawsuit designed to determine the legitimacy of the procedures themselves.

In addition, the difficulty of the Plaintiffs' predicament is particularly acute, considering the substantial media attention that Professor Bloomfield's accusations have garnered. His computer program's findings have been reported widely throughout the nation, in the *New York Times*, ("U. Of Virginia Hit By Scandal Over Cheating," May 10, 2001), the *Washington Post*, "Technology Snares Cheaters at U-Va.," May 9, 2001), and in several other papers around the

7

country. Amidst this media fury, Plaintiffs would almost certainly be unfairly branded "cheaters" before the Honor Committee, the Board of Visitors, or anyone else had considered the charges against them.

Finally, there is no harm or prejudice to Defendants in allowing Plaintiffs' to proceed anonymously. In seeking anonymity, Plaintiffs volunteer that they would reveal their identities to Defendants, in confidence, to allow Defendants to research their own academic files on Plaintiffs, and to prepare and discover any other potential evidence. Thus, for the reasons stated above, Plaintiffs motions for protective orders are granted, and the cases are permitted to proceed anonymously, provided that Defendants are informed of the identity of Plaintiffs, and Defendants in turn keep that information confidential.

## IV.

The Court now turns to Plaintiffs' motions for temporary injunctions. In deciding whether to grant a temporary injunction, a court should consider the following:

1.  the likelihood of irreparable harm to the plaintiff if the request for a temporary injunction is denied;
2.  the likelihood of irreparable harm to the defendant if the request is granted;
3.  the plaintiff's chance of success on the merits;
4.  the public interest.

*Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001); *Blackwelder Furniture Co. v. Seilig Mfg. Co,*, 550 F.2d 189, 195-97 (4th Cir. 1977). In considering these factors, "the first step...is for the court to balance the 'likelihood of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." *Blackwelder*, 550 F.2d at 195. In fact, "although [a court] may properly consider the four general factors" outlined above, "[t]he two more important

8

factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree." *Id.* at 196. Thus, the focus of the Court's analysis in this case is on the "balance-of-hardship" test. 194-95.

Plaintiffs allege that they are nearly certain to suffer considerable irreparable harm if the Honor Committee is permitted to continue the proceedings against them. First, they suggest that they would suffer serious reputation damage if the cases were permitted to continue. However, as Plaintiffs admit in their memoranda submitted to this Court, the Honor Committee's proceedings are confidential. For this reason Plaintiffs have sought, and this Court has granted, Plaintiffs' permission to proceed anonymously. It is therefore unlikely that Plaintiffs reputations could be damaged by proceedings that the University keeps confidential.

Secondly, Jane Doe suggests that she would suffer difficulty in enrolling in other institutions of higher learning if she was found guilty by an Honor Committee jury. This potential harm, however, is not likely or imminent since the Honor Committee has yet to set her case for trial. Jane Doe has already enrolled in another college or university, and states that she has no plans to transfer again, either this summer or in the coming school year. Thus, there is a extremely low probability that she would suffer any irreparable harm in the immediate future. Furthermore, even if the Honor Committee were to proceed against her and convict her of an honor offense, the harm suffered by that conviction would not be irreparable. She could proceed with this action and seek money damages and a permanent injunction requiring the Board of Visitors to void the findings of the Honor Committee. *See Betts v. Rector & Visitors of the University of Virginia*, 939 F. Supp. 461, 465 (W.D. Va. 1996).

Thirdly, John Doe insists that he could suffer the immediate, irreparable harm of having

9

his degree revoked. His Honor Committee trial is set to begin in a few days, and thus action could conceivably be taken against him in the immediate future. However, as John Doe concedes, the Honor Committee lacks the authority to revoke his degree. The sole option available to the Committee is to recommend to the General Faculty that his degree be revoked. It would then be in the hands of the Faculty Senate to consider that recommendation and then make its own, independent decision in the case. Furthermore, as with Jane Doe, "the *possibility* of adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Betts*, 939 F. Supp. at 465 (emphasis in original).

*Betts* involved a medical school applicant's charge that he had been denied admission to the school in violation of his rights under the Americans with Disabilities Act. In ruling on Betts' motion for a preliminary injunction, the court noted that the remedy would be improper because "if a subsequent decision on the merits revealed that plaintiff had been wrongly denied entry into the Medical School, the court could simply order his reinstatement." *Id.* at 466. Similarly, if the Board of Visitors were to unlawfully rescind John Doe's degree, he could seek an order directing the Board to re-issue it. *See also Goodreau v. Rector and Visitors of the University of Virginia*, 116 F. Supp. 2d 694, 697 (W.D. Va. 2000) (former student of the University seeking "a declaratory judgment against all Defendants stating that the degree revocation was null and void"). In conclusion, neither Plaintiff is likely to suffer any *irreparable* harm if the University's Honor Committee is permitted to proceed as it wishes.

When, as in this case, the likelihood of irreparable harm to the plaintiff is low, the importance of the "probability of success" prong increases. *See Blackwelder*, 550 F.2d at 195. A "'possible' irreparable injury has been held to suffice if there is a *strong* probability of success on

10

the merits." *Id.* at 196 (emphasis added). In this case, however, there is not a particularly strong likelihood of success for either Plaintiff. Therefore, the issuance of a preliminary injunction is not warranted.

The essence of Jane Doe's argument is that, although she was a student at the time charges were initiated against her, she was not a "student" at the time she was accused. Hence, she cannot be an "accused student" and the Honor Committee lacks jurisdiction to proceed against her. In particular, Jane Doe points to the language in Section I.A. of the By-Laws, which state, "A University student defined as any student who is registered, or intends to continue registration, in any University sponsored educational activity. Also included in this category are former students dismissed from the University for honor violations who are awaiting trial." Because this definition does not explicitly extend to "a former student who voluntarily leaves the University after an honor proceeding has been initiated, but before a formal accusation has been brought," she argues that she had no notice that she would could be tried by the Honor Committee after transferring to another college or university.

Even focusing solely on the language in the by-laws highlighted by Jane Doe, the Court still finds that Plaintiff's case rests on a dubious interpretation of the contract. But as Defendants note, there are other passages in the by-laws that make Plaintiff's argument even less tenable. First, the preamble to the by-laws informs all students that:

> The purpose of the by-laws of the Honor Committee is to describe *generally* the powers of the Honor Committee and its associated support officers, as well as the procedures of the Honor System. While the by-laws contain many specific provisions, *they are not meant to be an exhaustive list of enumerated powers, responsibilities, and procedures that extend to every imaginable contingency.* Instead they are a general framework from which the Committee, using sound judgment and reason, can deduce the extent of its power and responsibility, and

11

the procedural limitations on the Honor System. (Emphasis added).

It appears that Plaintiff's case falls into the category of imaginable contingencies that are not expressly provided for in the by-laws. Using sound judgment and reason, the Honor Committee could easily conclude that the powers and procedures of the Committee, described generally in the by-laws, reach out to cover Jane Doe's case.

Other portions of the by-laws also undermine the strength of Plaintiff's argument. For example, under Section IV.A.2., the by-laws state:

> All initiations must conform to the following guidelines: (a) the person whose conduct is in question must have been a student at the time of the alleged incident, and; (b) the initation must occur within two years of the alleged incident. If those criteria are not satisfied, the Vice-Chair for Investigations should drop the case.

The section appears to define the jurisdictional limits of the Honor Committee. If a student, at the time that charges are brought against her, satisfies the requirements of these guidelines, then the Honor Committee likely has jurisdiction over her case. If these requirements are not met at the time of initiation, then jurisdiction is lacking and the Committee should "drop the case." In sum, in reading the definition of "student" in the conjunction with the rest of the by-laws, the Court finds that it is doubtful that Jane Doe had no notice of the Honor Committee's intention to proceed against her after her transfer.

As for John Doe, his argument as regards the definition of "student" is stronger than Jane Doe's. Additionally, his position is supported by the Committee's original decision to dismiss his case. However, there is still considerable evidence to suggest that John Doe had notice of the University's intent to proceed against graduated students. First, the initiation guidelines, as described above, contemplate proceedings against a former student so long as: 1) the student was

12

enrolled at the University when the alleged violation occurred; and 2) the initiation is brought within two years of the alleged offense. Under these guidelines, the Honor Committee appears to have jurisdiction over John Doe's case. In addition, there is the longstanding and well-known practice of the Honor Committee to initiate proceedings against former students well after they have graduated. *See Goodreau*, 116 F. Supp. 2d 694.

Moreover, there is the fact, as Plaintiff concedes, that Board of Visitors of the University has the power to revoke his degree "for good cause and after due process." *Goodreau*, 116 F. Supp. 2d at 703. That is, "a university has the inherent power to revoke a degree if (1) there is proper cause for such action and (2) the former student is provided with notice and an opportunity to be heard that is sufficient under the Constitution." *Id.* In this case, Plaintiff's degree has not been revoked. Therefore, it remains to be seen whether the Board of Visitors will provide him with constitutionally sufficient notice and a hearing.

Furthermore, "Plaintiffs need to do more than merely demonstrate that the University violated its own procedures or rules" in responding to Professor Bloomfield's accusations. *Tigrett v. Rectors and Visitors of the Univ. of Virginia*, 137 F. Supp. 2d 670, 677 (W.D. Va. 2001) (*Tigrett II*). This Court has previously found that a violation of the Honor Committee's by-laws is not necessarily a violation of constitutional due process, even if the by-laws confer a procedural right. *See Tigrett v. Rectors and Visitors of the Univ. of Virginia*, 97 F. Supp. 2d 752, 758 (W.D. Va. 2000) (*Tigrett I*). In the Fourth Circuit, "not every departure from a state agency's stated or customary procedures constitutes a denial of constitutionally guaranteed procedural due process.... Indeed, the fundamental principle seems now established that in these cases the source of procedural guarantees is to be found solely in the due process clause rather than in any

13

specific procedures provided by the state." *Jones v. Board of Gov'rs of Univ. of North Carolina*, 704 F.2d 713, 716-17 (4th Cir.1983).

Thus, if John Doe were to successfully prove that the Honor Committee had failed to follow its own procedures as delineated in the by-laws, he would still have to go farther to show that he had suffered a constitutional wrong. He would have to demonstrate that he had been denied constitutionally adequate notice and a hearing. To date, Plaintiff's arguments do not support the conclusion that a procedural deprivation of constitutional significance has yet occurred. In short, as with the "balance-of-hardship" test, the "likelihood of success on the merits" analysis weighs strongly in favor of Defendants.

The public interest prong of the *Blackwelder* test also supports Defendants' position that a preliminary injunction should not be granted. While the public has a powerful interest "in the enforcement of constitutional rights and state contract laws," there is another compelling public interest "in preserving unfettered academic responsibility for appropriate academic decisionmaking...." *Betts*, 939 F. Supp. at 470. In this case, Plaintiffs seek to prevent the University from proceeding with two cases of alleged plagiarism. It would be hard to imagine a question more central to the academic operation of a university than the alleged theft of ideas. Furthermore, as Plaintiffs themselves admit, "While the Honor Committee proposes to take action, it has not yet done so and the faculty senate has not only taken no action, it has threatened none." The charges of plagiarism by Professor Bloomfield, however, have been made and have been widely reported throughout the University and around the nation. Thus, while Plaintiffs face no imminent, potential threat to their individual constitutional rights, the University's and the public's academic interest in handling the many allegations of plagiarism is immediate.

14

Finally, the Court notes that while Plaintiffs allege that the Honor Committee has deprived them of their rights to procedural due process, they still have the opportunity to avail themselves of the procedures that the Committee has instituted for their protection. That is, there still exists the promise of due process within the University's administrative setting. John Doe and Jane Doe are free to make the same jurisdictional arguments discussed above to the Honor Committee that is investigating them.

## V.

Finally, the Court must consider Defendants' motions to dismiss. These motions are based on a claim of Eleventh Amendment immunity. Defendants' argue, "Because in the instant case Petitioner[s] [have] named only the University of Virginia as respondent, [their] claims are barred by the Eleventh Amendment." As noted above, Plaintiffs have now amended their complaints, and seek injunctive relief against the Rector and Board of Visitors individually to prevent them from acting in a manner that would allegedly violate Plaintiffs' constitutional rights. As amended, Plaintiffs' claims are permitted to proceed pursuant to the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). Defendants' motions to dismiss must therefore be denied.

## VI.

In conclusion, Plaintiffs' motions to amend are GRANTED, and the title of the cases are amended as indicated above. Plaintiffs' motions for protective orders to proceed anonymously are also hereby GRANTED. Plaintiffs' motions for temporary injunctions, however, are DENIED. Defendants' motions to dismiss are DENIED.

15

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum

Opinion to all counsel of record.

ENTERED: _____
U.S. District Judge

3/21/02
Date

A TRUE COPY, TESTE:
JOHN N. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

16